[Cite as *State v. Berry*, 2013-Ohio-2380.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## DEFIANCE COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,               CASE NO.  4-12-03

      v.

DONNY L. BERRY,                O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Defiance County Common Pleas Court
Trial Court No. 11-CR-11115

**Judgment Affirmed**

Date of Decision:   June 10, 2013

APPEARANCES:

    *Stephen D. Long*  for Appellant

    *Morris J. Murray and Russell R. Herman*  for Appellee

**SHAW, J.**

{¶1} Defendant-appellant Donny L. Berry ("Berry") appeals the January 3, 2012, judgment of the Defiance County Common Pleas Court sentencing Berry to life imprisonment, with the possibility of parole after thirty years, upon Berry's jury trial convictions for Aggravated Murder, Involuntary Manslaughter, Conspiracy to Traffic Cocaine, Conspiracy to Traffic Marijuana, two counts of Tampering with Evidence, and Berry's subsequent guilty plea to the charge of Attempted Burglary.

{¶2} On April 13, 2011, Berry was indicted for Aggravated Murder (Count 1), in violation of R.C. 2903.01(A), an unclassified felony, Involuntary Manslaughter (Count 2), in violation of R.C. 2903.04(A), a felony of the first degree, Conspiracy to Traffic Cocaine (Count 3), in violation of R.C. 2923.01(A)(2), Conspiracy to Traffic Marijuana (Count 4), in violation of R.C. 2923.01(A)(2), a felony of the fourth degree, two counts of Tampering with Evidence (Counts 5 and 6), in violation of R.C. 2921.12(A)(1), both felonies of the third degree, Attempted Aggravated Robbery (Count 7), in violation of R.C. 2923.02 and R.C. 2911.01(A), a felony of the second degree, and Attempted Burglary (Count 8), in violation of R.C. 2923.02 and R.C. 2911.12(A)(2), a felony of the third degree. (Doc. 1). The first six counts were alleged to have occurred

on or about February 20, 2011, and the final two counts were alleged to have occurred on or about November 2, 2010. (*Id.*)

{¶3} On April 14, 2011, Berry was taken into custody. On April 19, 2011, Berry appeared for arraignment and pled not guilty to all counts in the indictment. (Doc. 9).

{¶4} On May 17, 2011, Berry's counsel filed a Motion for Severance of Counts 1 through 6 from Counts 7 and 8, and a Motion for Funds to hire a private investigator. (Docs. 15, 16). On June 6, 2011, Berry's counsel also filed a Motion to Compel. (Doc. 22). On June 9, 2011, the State filed a Memorandum in Response to Berry's Motion to Compel, and the State also filed supplemental discovery. (Docs. 24, 25).

{¶5} On June 15, 2011, Berry's counsel filed a Motion *in Limine* and a Motion to Dismiss Counts 2, 3, 4, 6, and 8 of the Indictment. (Docs. 29, 30).

{¶6} On June 16, 2011, a pretrial was held at which the trial court addressed Berry's Motion to Sever, Motion for Funds, Motion *in Limine*, and Motion to Compel. (Doc. 126). The trial court denied Berry's Motion to Compel, with the understanding that the State would supplement discovery as it became aware of new material. (*Id.*) The trial court granted Berry's Motion to Sever counts one through six from counts seven and eight and granted Berry's Motion for Funds. (*Id.*) Regarding Berry's Motion *in Limine*, the trial court found the

motion in the nature of a Motion to Suppress and set the matter for further hearing along with the Motion to Dismiss. (*Id*.)

{¶7} On June 27, 2011, the trial court heard Berry's Motion to Suppress, styled a Motion *in Limine*, and Motion to Dismiss Counts 2, 3, 4, 6, and 8 of the Indictment. (Doc. 127). At the hearing, Berry's counsel withdrew two of the branches of his Motion, the State agreed not to present testimony challenged in one of the branches, and the trial court denied the remainder as being premature. (*Id*.); (Doc. 42). The trial court also denied Berry's Motion to Dismiss as being premature. (*Id*.); (*Id*.)

{¶8} On July 21, 2011, Berry's counsel filed a Motion to Vacate Trial Date along with a Request for a Competency Evaluation of Berry. (Doc. 36). On July 22, 2011, the trial court granted the motion. (Doc. 37).

{¶9} On August 4, 2011, Berry filed a Motion to Expedite Trial Date. (Doc. 45).

{¶10} On September 20, 2011, Berry's counsel filed a Motion to Suppress statements made by Berry in an April 15, 2011, interview. (Doc. 54).

{¶11} On September 20, 2011, the court held a hearing on Berry's competence to stand trial, finding Berry competent. (Doc. 67).

{¶12} On October 14, 2011, the court held a hearing on Berry's Motion to Suppress statements made by Berry during an April 15, 2011 interview. The court denied that motion to suppress. (Doc. 68).

{¶13} On October 31, 2011, Berry's counsel filed a Motion to Dismiss arguing that Berry's Speedy Trial rights had been violated. (Doc. 60). On November 4, 2011, a hearing was held on the motion wherein the court determined that due to various filings by Berry, Speedy Trial time had been tolled and Berry's motion was denied. (Doc. 74).

{¶14} On November 15, 2011, Berry's jury trial began on counts 1 through 6 of the indictment. The trial continued through November 21, 2011. On November 21, 2011, the jury found Berry guilty of Aggravated Murder, (Count 1), in violation of R.C. 2903.01(A), an unclassified felony, Involuntary Manslaughter (Count 2), in violation of R.C. 2903.04(A), a felony of the first degree, Conspiracy to Traffic Cocaine (Count 3), in violation of R.C. 2923.01(A)(2), with the further finding beyond a reasonable doubt that the amount of Cocaine exceeded 100 grams, a felony of the second degree, Conspiracy to Traffic Marijuana (Count 4), in violation of R.C. 2923.01(A)(2), with the further finding beyond a reasonable doubt that the amount of Marijuana involved exceeded 1,000 grams but was less than 5,000 grams, a felony of the fourth degree, and two counts of Tampering with

Evidence (Counts 5 and 6), in violation of R.C. 2921.12(A)(1), both felonies of the third degree. (Doc. 101).

{¶15} On December 5, 2011, a pretrial was held with regard to the remaining two counts from the indictment. (Doc. 102). At that pretrial, Berry elected to change his previously tendered plea of not guilty to guilty to the charge of Attempted Burglary, with the State agreeing to reduce the degree of the felony to a felony of the third degree, and dismiss the remaining count against Berry, Attempted aggravated Robbery. (*Id.*)

{¶16} On January 3, 2012, the trial court held a sentencing hearing. Berry was sentenced to a term of life imprisonment with parole eligibility after serving 30 years as to Count 1, Aggravated Murder. (Doc. 104). As to Count 2, the trial court found that the Involuntary Manslaughter was an allied offense of the Aggravated Murder, and therefore merged for purposes of sentencing. (*Id.*) The trial court sentenced Berry to a term of seven years of imprisonment as to Count 3, Conspiracy to Traffic Cocaine, a felony of the second degree, a term of twelve months as to Count 4, Conspiracy to Traffic in Marijuana, a felony of the fourth degree, with Count 4 to be served concurrently with Count 3. (*Id.*) The trial court further sentenced Berry to a term of imprisonment of 36 months, each, as to Counts 5 and 6, Tampering with Evidence, with Count 5 to be served concurrently with count 6. (*Id.*) The court also sentenced Berry to a term of 36 months in

prison on the Attempted Burglary charge. (*Id*.) The court ordered that Counts 3, 5 and 8 would be served consecutively to the sentence imposed in count 1. (*Id*.) An entry reflecting Berry's sentence was filed January 13, 2012. (*Id*.)

**{¶17}** It is from this judgment that Berry appeals, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THE TRIAL COURT ERRED IN DENYING DEFENDANT/APPELLANT'S MOTION FOR ACQUITTAL AND THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE JURY'S CONVICTION OF DEFENDANT/APPELLANT FOR THE CRIME OF AGGRAVATED MURDER, IN VIOLATION OF R.C. 2903.01, COUNT I OF THE INDICTMENT.**

**ASSIGNMENT OF ERROR 2**
**THE JURY'S VERDICT FINDING DEFENDANT/APPELLANT, GUILTY BEYOND A REASONABLE DOUBT OF THE CRIME OF AGGRAVATED MURDER, IN VIOLATION OF R.C. 2903.01, COUNT I OF THE INDICTMENT, IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR 3**
**DEFENDANT APPELLANT WAS DENIED A FAIR TRIAL DUE TO THE INNEFECTIVE ASSISTANCE OF COUNSEL.**

*First and Second Assignments of Error*

**{¶18}** In his first and second assignments of error, Berry argues that the trial court erred in denying his Criminal Rule 29 motion for acquittal, that there was insufficient evidence to convict him of Aggravated Murder, and that his conviction for Aggravated Murder was against the manifest weight of the

evidence. In arguing that the trial court erred in denying his motion for acquittal and that there was insufficient evidence to convict him, Berry claims there was no proof that he was the person that actually killed Kerry Christopher. In arguing that his conviction was against the manifest weight of the evidence, Berry also argues that there were other people with "more plausible motives" to kill Kerry Christopher, that the statements of various witnesses were not credible, and that Kerry Christopher's death could not have been planned.

{¶19} Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.* In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements proven beyond a reasonable doubt. *State v. Smith*, 80 Ohio St.3d 89, 113 (1997).

{¶20} The test for sufficiency of evidence has also been held applicable to determining a Crim.R. 29 motion for acquittal. "Pursuant to Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt. *State v. Bridgeman*, 55 Ohio St.2d 261, syllabus (1978). This court has previously found

that the *Bridgeman* standard "must be viewed in light of the sufficiency of evidence test * * *." *State v. Kneply*, 3d Dist. No. 7-11-02, 2012-Ohio-406, ¶ 23, quoting *State v. Foster*, 3d Dist. No. 13-97-09, (Sept. 17, 1997).

**{¶21}** The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' in criminal cases, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.'" *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

**{¶22}** Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *Volkman, supra,* at ¶ 12; *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Id.* In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Andrews,* 3d Dist. No. 1–05–

70, 2006-Ohio-3764, ¶ 30, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983); *Thompkins*, 78 Ohio St.3d at 387.

**{¶23}** Aggravated Murder is codified in Ohio Revised Code 2903.01(A). It reads, "No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy." R.C. 2903.01(A).

**{¶24}** At trial the State called 21 witnesses to prove Berry committed, *inter alia*, Aggravated Murder.[1] The State presented the following testimony and evidence related to the February 20, 2011, murder of Kerry Christopher (hereinafter referred to by his alias "New York"), which has been arranged chronologically for ease of understanding.

**{¶25}** On Friday February 18, 2011, two days before New York's murder, Jonathan Gaines testified that Berry visited Gaines' home in Toledo, Ohio. (Tr. at 471). Gaines testified that Berry was looking for gun shells for a .357 Magnum "off the streets." (Tr. at 472). Gaines testified that Berry told Gaines that Berry was going to make a "power move" and that if Berry was not seen or heard from by Monday, Berry was either dead or in jail. (Tr. at 473). Gaines testified that he

---

[1] There was also a significant amount of testimony relating to various other charges in this case; however, Berry only challenges his Aggravated Murder conviction under these assignments of error. Therefore, in the interest of brevity, where the testimony does not directly relate to the murder conviction that is challenged on appeal, that testimony will not be referenced.

had previously been involved in drug trafficking and that he knew New York and Berry through that involvement. (*Id.*)

{¶26} The next day, on Saturday February 19, 2011, Berry's car broke down while he was on his way to Lima, Ohio. (State's Ex 64).[2] Berry called New York, who had an apartment in Lima with a man named Calvin Lane, to pick him up. (*Id.*) New York picked Berry up and together they traveled to Fort Wayne so New York could purchase two kilos of cocaine. (*Id.*); (Tr. at 238). New York and Berry spent that night in Fort Wayne at Shannon Wilson's residence. (Tr. at 183). Shannon Wilson was the mother of New York's child. (Tr. at 179).

{¶27} On Sunday February 20, 2011, Berry stayed at Shannon's apartment and watched her children while Shannon and New York left and acquired the cocaine. (Tr. at 183, 238). New York and Shannon then returned to Shannon's Fort Wayne apartment where Berry was, and the three of them departed for Lima, taking two separate cars. (Tr. at 188). New York and Berry rode together in New York's Cadillac, and Shannon followed them in an Audi to New York's Lima apartment. (Tr. at 197). Upon their return to Lima, Shannon stayed at New York's apartment for approximately 20 minutes, and then returned to Fort Wayne. (Tr. at 189). According to Shannon, New York's roommate Calvin was not home

---

[2] State's Exhibit 64 is an interview of Berry that was conducted February 24, 2011. It was shown to the jury during the trial.

at the time she was present in New York's apartment, and she left around 7 p.m. (Tr. at 240).

{¶28} Later on Sunday February 20, 2011, after Shannon left New York and Calvin's apartment, Calvin returned to the apartment and observed New York and Berry laughing and hanging out. (Tr. at 215). Calvin remained at the residence with the two of them until New York and Berry left together, somewhere between 8 and 9:30 at night. (Tr. at 211, 218). According to Berry himself, when he and New York left New York's apartment that night, they traveled to Defiance.[3] (State's 64).

{¶29} Shortly after 10:30 on Sunday evening, Andrew Hershberger, a friend of New York's, received a call from New York. (Tr. at 251). New York told Andrew that he was with Berry and that New York was going to come to Andrew's house in Defiance and pick him up. (*Id*.) Andrew testified that New York said he would be at Andrew's house "soon." (Tr .at 246). Andrew waited for New York to arrive, but New York never came. (*Id*.) Andrew called and sent New York text messages inquiring into his whereabouts, and gave up when he received no response. (*Id*.) Phone records corroborated Andrew's testimony.

{¶30} Evidence revealed that at some point between 10:40 and 11 p.m., New York was killed by a "contact" gunshot wound to the left side of his head

---

[3] Although Berry would give multiple inconsistent statements about what happened later that evening, he never changed his story regarding the fact that he left New York's apartment with New York and the two of them traveled to Defiance.

while he was sitting in the passenger seat of his Cadillac. (Tr. at 387, Tr. at 450, 718). Through the investigation, it was determined that New York was killed on Domersville Road at the vacant, foreclosed-upon former residence of Berry's mother. (Tr. at 353-367).

{¶31} Evidence revealed that New York was shot in the car, dragged out of it, left in a spot in the driveway long enough for his blood to pool, stripped of his outer clothes, and then placed in the trunk of the Cadillac. (*Id.*).

{¶32} For the next couple of days, New York's baby's mother Shannon attempted to find him, calling around to Andrew and Berry, and various others looking for New York. (Tr. at 191-195, 247). On February 23, 2011, Andrew called Shannon stating that he thought he recognized New York's black Cadillac at Degler apartments in Defiance. (Tr. at 247, 256). Shannon called the police and the police responded to the scene. (Tr. at 256).

{¶33} Patrolman Jeffrey Spelman was one of the people that responded to the scene and he noted that there were four wheels in the backseat of the black Cadillac and that there was what appeared to be blood spatter in various locations throughout the car. (Tr. at 169). The Cadillac was registered to New York. Berry and Andrew gathered at the scene when the police came to look at the Cadillac thinking that they might open it up. (Tr. at 256). Berry gave a statement at the scene to Patrolman Spelman that he had not seen New York since New York

dropped Berry off at his mother's house that previous Sunday. (Tr. at 169). Andrew noted that he thought something did not look right with Berry that day. (Tr. at 257).

{¶34} The police ultimately obtained a warrant and searched the Cadillac, finding New York's body in the trunk. (Tr. at 264). It was determined that the location where the car was found outside of Degler Apartments was not likely the location where New York was killed. (Tr. at 590, 704).

{¶35} When Defiance County Chief Deputy John Engel and Lieutenant Cliffton Vandemark learned that Berry was the last person that had been seen with New York, they started looking for places that "Berry and New York were comfortable in meeting." (Tr. at 590). Chief Deputy Engel and Lieutenant Vandemark had dealt with Berry in the past as an informant, and Lieutenant Vandemark had met with him at the Domersville Road property. (Tr. at 591, 700). Thus one of the places that officers were sent to check as a potential crime scene was the Domersville Road location. (Tr. at 590, 704).

{¶36} Police responded to Domersville Road, and found blood at the scene that was later tested and determined to be New York's. (Tr. at 358). Inspecting the scene, Police determined that it was the site of New York's murder, that he had been shot, dragged out of the car, left in the snow long enough for his blood to pool, and then placed into the trunk of the car. (Tr. at 361-367, 706).

{¶37} At this point, on February 24, 2011, the police conducted their first interview of Berry. (Tr. at 613); (State's Ex. 64). When the police interviewed Berry, they were already aware that the location of New York's murder was likely Berry's mother's former house on Domersville Road. (Tr. at 608-609). However, they did not initially reveal to Berry that they were aware of this information, choosing to ask Berry about what had happened the weekend of the homicide and about Berry's last contact with New York. (State's Ex. 64).

{¶38} In the interview, Berry claimed that on Sunday February 20, 2011, New York dropped him off at his mother's house in Defiance after they left Lima together and that was the last time he had seen New York. (*Id.*) The remainder of Berry's story regarding the weekend's previous events was similar to what was corroborated by other witnesses that testified at trial—Berry went to Fort Wayne with New York, returned to New York's apartment in Lima on Sunday February 20, 2011, and then left with New York. (*Id.*)

{¶39} Later in the interview, after hearing Berry's story, police told Berry that they thought New York had been killed at Berry's mother's old residence on Domersville Road. (*Id.*); (Tr. at 609). Berry then told a story about how he was going to give New York some tires at the old house, but stated adamantly that New York did not go to the house with him that night. (State's Ex. 66). Berry said on the night of New York's death he drove his mother's car over to Spring

Meadows after New York dropped him off to try and meet with a female. (*Id.*) As the police repeatedly questioned Berry about whether Berry was present at the time of New York's death or knows who was present, Berry adamantly denied being in the car, or knowing who killed New York. (State's Ex. 66). Berry told police to speak with Calvin, New York's roommate, and Andrew Hershberger, who Berry knew New York was going to meet in Defiance that night. (*Id.*) The police asked to search Berry's phone. (*Id.*) Berry then invoked his right to speak to an attorney, and the interview was ended. (*Id.*)

{¶40} Based on the interview with Berry, the police continued to investigate, speaking with people that were close to New York and may have had motive to kill New York or could give the police more information such as Shannon Wilson, Calvin, Andrew Hershberger, and Jonathan Gaines. (Tr. at 616). Gaines was interviewed and had an alibi, which was corroborated through investigation. (Tr. at 618).

{¶41} The police also obtained a search warrant to search Berry's mother's current home. (Tr. at 618). The police then searched Berry's mother's residence. (Tr. at 622). Afterward, the police requested to search Berry's mother's vehicle, a Chrysler Pacifica, which police had learned from Berry and Jonathan Gaines, that Berry had been driving the day after New York's death. (Tr. at 625-26). Berry's mother consented to allow her Chrysler Pacifica to be searched and the police

uncovered blood in the Pacifica, which was tested and determined to be New York's. (Tr. at 625, 358).

{¶42} When searching Berry's mother's residence, the police mistakenly left the affidavit along with the search warrant, which contained all the information that the police had up to that point in the investigation. (Tr. at 624). Later that night after the search, Berry contacted police and informed police that he wanted to speak with them again. (Tr. at 624-626).

{¶43} Berry then appeared with counsel to talk to police and give a second interview. (Tr. at 627). In the second interview, Berry stated that on the night of New York's death, he and New York had gone out to his mother's old house on Domersville Road and a black SUV pulled in behind them. (State's Ex. 68). Berry stated that three men got out of the SUV, one he recognized as "Moon," and ordered Berry out of the car. (*Id*.) Berry stated that he did not know Moon's real name, he just knew him by "Moon." (*Id*.) Berry stated that New York was then shot in the Cadillac, taken out of the car, stripped, and that Berry then placed New York in the trunk of the Cadillac at the behest of the three men. (*Id*.) Berry stated that the three men then took his wallet and took both vehicles and drove off, leaving him at the Domersville Road property.[4] (*Id*.) Berry claimed that he then

---

[4] Berry would later be seen on Wal Mart's security cameras with a wallet "exactly as he described" that he claimed in this interview had been taken by the three men. (Tr. at 640).

walked back to his mother's house, which was over five miles, in a snow/ice storm on a four-lane highway. (Tr. at 632); (State's Ex. 68).

{¶44} During the interview, Chief Deputy Engel noted inconsistencies in Berry's story, including what Berry did with the bloody clothes, whether Andrew Hershberger was at the scene, and where the tires that were in the backseat of the Cadillac had been taken from. (Tr. at 631-33).

{¶45} Following the interview, the police attempted to track down "Moon." (Tr. at 634). After speaking with the FBI and other local law enforcement groups, the police came up with two men that could have been the "Moon" Berry was referring to: one who was known locally as "Moon" and the other who was known as "Moony." (*Id.*) Berry was brought back in to attempt to identify "Moon," and he selected the man, Ralph Upshaw, known as "Moon." Berry said that this "Moon" was involved in New York's death. (Tr. at 635).

{¶46} Police investigated Moon, who was found to be "very cooperative" with the investigation. (Tr. at 712). Police also searched Moon's girlfriend's vehicle with Moon's consent, which was a black Dodge Durango (SUV), as Moon did not otherwise own an SUV. (Tr. at 713). Although police did find traces of blood in the vehicle, the blood was determined not to be New York's. (Tr. at 390). Moon testified that he had known New York for five or six years but had only met Berry twice with New York. (Tr. at 526). Moon testified during one of those

meetings, New York and Berry had two guns, one of which was a .357. (Tr. at 534). After looking into Moon's alibi, police were "comfortable" eliminating Moon as a suspect. (Tr. at 724).

{¶47} Subsequently, Berry was indicted and arrested for, *inter alia*, the Aggravated Murder of New York. The day after he was arrested, Berry contacted the police and stated that he again wanted to speak with police regarding New York's death. (Tr. at 641-42).

{¶48} This time, in his third interview, Berry stated that on the night of New York's death, Berry and New York drove out to the Domersville Road property to meet up with Berry's brother Sidney. (State's Ex. 70). Berry stated that he was under the impression that Sidney and New York had business to conduct. (*Id.*) Berry told police that Sidney, Moon, and one other person pulled up behind the Cadillac in a black SUV, and ordered Berry out of the car. (*Id.*) Berry stated that he got in the back of the SUV, and watched a flash go off in the Cadillac as his brother Sidney shot New York. (*Id.*) Berry then stated that he was made to help put New York's body in the trunk, and that he was then driven to his mother's house and dropped off. (*Id.*) Berry stated that he had not talked to Sidney since the incident. (*Id.*) In prior interviews, Berry had stated that he did not know where his brother was and thought he might have been out of state, and

that they had not had contact in over six months because they did not talk. (Tr. at 655).

{¶49} The police then investigated whether there was any connection between Sidney and New York, and Sidney and Moon. (Tr. at 659, 715). The police found no connections between Moon and Sidney, and found that there was no indication of any recent contact between Sidney and New York. (*Id.*) In addition, police found through Sidney's cell phone records that Sidney was around Pontiac Michigan shortly before and shortly after the death of New York.[5] (*Id.* at 715)

{¶50} Further testimony produced at trial illustrated that Berry was in possession of New York's bag that contained the marijuana and cocaine that New York had been transporting, and that Berry also had money after New York's death whereas there was testimony that he was "broke" on the Friday before New York's death. (Tr. at 472). Testimony was also given that Berry sent text messages and made calls to New York on the day following New York's death, when Berry, even according to his own later statements, would have known New York was dead. (State's Ex. 70). Moreover, testimony was presented at trial that

---

[5] Lieutenant Cliffton Vandemark testified that Sidney's phone records established that he made a call from Pontiac, Michigan at roughly 8:35 p.m. on the night of New York's death, and then again at roughly 12:30 a.m. (Tr. at 715). Vandemark testified that he drove the distance between the site of death and Pontiac Michigan and found it to be roughly 2 hours and 40 minutes one way, making it highly improbable for Sidney to have been present. (*Id.*)

in the days following New York's death, Berry repeatedly told others that he did not know where New York was. (Tr. at 193, 486, 504).

{¶51} Thus at trial there was testimony of Berry looking for bullets for a gun and that Berry stated he was looking to make a "power move." There was testimony that Berry was the last person seen with New York, and that New York was killed outside of Berry's mother's vacant house. In addition, New York's blood was found in Berry's mother's car, which Berry was driving the day after New York's murder. Berry also had New York's bag of drugs, and suddenly had money whereas on Friday he was broke.

{¶52} Furthermore, Berry gave multiple accounts of what happened on the night of the incident, changing his story repeatedly. First, Berry stated that New York had merely dropped him off at his mother's residence in Defiance. He told this story to the police and to New York's friends who were looking for New York. Second, Berry stated that he was present when New York was shot by an unknown gunman, and that he was left at the scene to walk back the five miles into Defiance to his mother's house on a busy highway during a winter storm. Third, Berry stated that the he was present when his brother Sidney had shot New York and that he was driven to his mother's residence and dropped off.

{¶53} While Berry argues first on appeal that the trial court erred in denying his Crim.R. 29 motion for acquittal, we find that reasonable minds could

find that each element had been proven and that Berry had committed Aggravated Murder. In addition, although Berry argues that there was insufficient evidence to convict him claiming that there was no proof that he was the person that killed New York, under these circumstances, we find that there was sufficient direct and circumstantial evidence presented to establish that Berry committed each element of Aggravated Murder beyond a reasonable doubt. Accordingly, Berry's first assignment of error is overruled.

{¶54} In arguing that his conviction was against the manifest weight of the evidence, Berry contends that there were other people with plausible motives, there was no direct evidence that Berry caused New York's death (only that he was present), and that the murder could not have been pre-planned because Berry could not have predicted that his car would break down on the way to Lima on the day before the murder.

{¶55} Although Berry argues that there were other people with motive to kill New York, the jury heard testimony regarding all of the other people who had potential motives to kill New York, and the police's investigation into those individuals. Through the investigation, none of the people that Berry accused in his repeatedly altering statements could be connected to the February 20, 2011, homicide.

{¶56} Moreover, the jury heard testimony regarding Berry's potential motives. The jury heard Jonathan Gaines testify that Berry said he was going to make a "power move." The jury also heard Detective John Engel testify that Berry had, at least at one point in time, wanted to "control Defiance" (in reference to drugs). (Tr. at 663-664).

{¶57} Based upon our review of the evidence including the transcripts and the exhibits, we cannot find that the jury "clearly lost its way" or that there was a "manifest miscarriage of justice." Therefore, we do not find Berry's conviction was against the manifest weight of the evidence. Accordingly, Berry's second assignment of error is overruled.[6]

{¶58} Berry makes another argument before his final assignment of error that is not listed separately as an actual assignment of error, so we will address it here, as it does not fall under any of the other assignments. In this argument, Berry claims that the trial court erred in allowing Shannon Wilson to be recalled over the objections of counsel.

{¶59} Evid. R. 611(A) provides that the trial court exercises control over the mode and order of interrogating witnesses and the presentation of evidence to ensure that the interrogation and presentation of evidence are effective in

---

[6] In Berry's statements of his first two assignments of error, he only challenges his conviction for Aggravated Murder. However, had he argued that there was insufficient evidence to sustain his remaining convictions, or that the remaining convictions were against the manifest weight of the evidence, those assignments would be overruled as well, as our review of the transcript and the evidence supports the jury's findings.

ascertaining the truth. Whether to permit a witness to be recalled to the stand to give additional testimony is a matter committed to the sound discretion of the trial court. *State v. Taylor*, 3d Dist. No 1-3-20, 2003-Ohio-7115, ¶ 18, citing *State v. Sims*, 3 Ohio App.3d 321, 329 (8th Dist.1981). An abuse of discretion connotes more than an error of law or judgment; it implies an attitude of the trial court that is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶60} In this case, the State called Shannon Wilson, the mother of New York's child. (Tr. at 179). Shannon Wilson testified originally that Berry and New York came to her residence in Fort Wayne. (Tr. at 183). Shannon testified that Berry stayed at her residence while New York and Wilson left, and that when New York returned he had a shoebox she believed had two kilos of cocaine in it—cocaine which she originally testified she did not personally see. (Tr. at 198). After Shannon was cross-examined, the State called its next witness, Calvin Lane, and once Lane finished testifying, the State recalled Shannon. (Tr. at 207, 230).

{¶61} When Shannon was recalled, she testified that she knew New York was purchasing cocaine in Fort Wayne and she knew that he had acquired cocaine. (Tr. at 238). She testified that she wanted some of the cocaine to sell but New York told her he needed it, so he gave her $200 instead. (Tr. at 238).

{¶62} Thus the difference between Wilson's original testimony and her testimony when she was recalled was her definitively stating that she knew New York was acquiring and had acquired cocaine when he went to Fort Wayne. (Tr. at 240). When asked why her testimony had changed, Wilson testified that when she came into court that day she was arrested on a bench warrant and was afraid of incriminating herself. (Tr. at 232). Wilson testified that issue had been cleared up, so she gave the new testimony. (*Id.*)

{¶63} Defense counsel repeatedly objected to allowing Wilson to testify again. (Tr. at 230, 233, 237). The court inquired into the circumstances of why Wilson should be allowed to be recalled, and specifically stated that Wilson was subject to cross-examination and that the matters could be inquired into on cross-examination. (Tr. at 237).

{¶64} Based on the court's inherent authority to regulate witnesses called, we cannot find that the trial court abused its discretion in allowing Shannon to be recalled, especially in light of the fact that she was fully subject to cross-examination and the jury had the ability to judge her credibility. Accordingly, this argument is found not well taken, and if it was styled specifically as an assignment of error, it would be overruled.

*Third Assignment of Error*

{¶65} In his third assignment of error, Berry argues that he was denied a fair trial due to the ineffective assistance of his trial counsel. Specifically, Berry claims that counsel's failure to object to certain testimony was prejudicial to Berry, and that counsel made premature and ineffective motions that tolled the running time under the speedy trial statute, thus allowing the State further time to prepare its case against Berry.

{¶66} "Reversal of convictions on ineffective assistance requires the defendant to show 'first that counsel's performance was deficient and, second that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.'" *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, at ¶ 105, quoting *Strickland v. Washington*, 466 U.S. 668, 669, 104 S.Ct. 2052 (1984). When considering a claim of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

{¶67} A tactical decision by trial counsel, who as a licensed attorney is presumed to be competent, is not by itself enough to show ineffective assistance of counsel simply because the strategy did not result in an acquittal. *State v. Clayton*, 62 Ohio St.2d 45, 48-49 (1980); *State v. Timm,* 3d Dist. No. 13–11–23, 2012-Ohio-410, ¶ 31. "Furthermore, trial counsel's failure to object is generally viewed

as trial strategy and does not establish ineffective assistance." *State v. Turks,* 3d. Dist. No. 1–08–44, 2009-Ohio-1837, ¶ 43, citing *State v. McKinney,* 11th Dist. No.2007–T–0004, 2008-Ohio-3256, ¶ 191; *State v. Gumm*, 73 Ohio St.3d 413, 428; *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 103.

{¶68} In arguing that his counsel was ineffective, Berry first contends that his counsel failed to object to inadmissible hearsay evidence. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is generally not admissible unless an exception applies. Evid.R. 802.

{¶69} Berry first claims that his counsel should have objected to the testimony of Detective Dave Richards when Detective Richards was testifying as to what Shannon Wilson had informed him. In the portion of testimony cited, Detective Richards was being asked if he spoke to Shannon Wilson, and what he learned in speaking to Shannon Wilson. Berry argues that allowing Detective Richards to tell the jury what Shannon Wilson had informed him of improperly bolstered her credibility and was hearsay. However, at this point in the trial, Detective Richards was merely testifying to how he proceeded with his investigation and what he learned from one witness to the next that led him forward. We do not find this is hearsay. However, even if the statements were

hearsay, Shannon Wilson took the stand and was fully subject to cross-examination. Moreover, much of the information learned from Shannon, such as New York having an apartment with Calvin Lane, Berry made in statements in interviews to the police. Under these circumstances, we cannot find that counsel's failure to object was deficient or prejudicial.

{¶70} Berry makes a similar claim regarding the testimony of Sergeant Delaney who spoke with Jonathan Gaines. Sergeant Delaney's testimony merely detailed how his part of the investigation proceeded, including when and why he spoke with Jonathan Gaines, and Delaney's attempts to track Berry's movement around the date of the murder. In addition, Jonathan Gaines took the stand, and was fully subject to cross-examination. Thus we cannot find counsel's failure to object to Sergeant Delaney's testimony was deficient or prejudicial.

{¶71} Berry next argues that Deputy Engel was improperly allowed to testify as to what he thought Berry was "thinking" during Berry's interviews. Berry does not cite specific provisions of the transcript to support his argument that Deputy Engel improperly testified as to Berry's thoughts. Our own review of the transcript revealed the following locations where Deputy Engel might have referred to Berry's thoughts during the interview.

> **And if you saw at first, we did not have to urge the Defendant, Donny Berry, to explain to us why he was at the sheriff's office. He already had a predisposition. He knew why we wanted to talk to him.**

(Tr. at 614).

* * *

**Then his story changes to meet what our knowledge is of the crime at that point in time and he then addresses the fact that he is there at the scene but only trying to state that he's just there so it's not his fault but that, again the further we look into it goes away.**
(Tr. at 651).

* * *

**In this – During all the interviews, Donny would – We watch his movements, his body language.  When he would – He can turn on the charm or he can turn on the false pretenses, so to speak.  He – He begins to act like he's crying.  He – But then he quickly shuts that off.  There is [sic] no tears shed.  He can sniffle and, and over the years of dealing with Donny, he can do this quite often.  He changes quite rapidly.  He can turn the charm on and then he can be very angry, very intimidating and, and abusive.**

(Tr. at 653-654).

* * *

**Q.   So if he were still looking for it, and the Defendant had it [drug bag], he might want some protection?  You understand what I'm saying?**

**A.   Yes, I do.  Again, that's kind of a – He – He may think that he needs protection.**

(Tr. at 696-97).

{¶72} Based on a review of the transcript and these sections, we do not find

that Chief Deputy Engel testified to anything other than his observations.  In fact,

in the one section where the prosecutor specifically asked Chief Deputy Engel about why Berry thought he might have needed protection, Berry's counsel did object, and it was sustained on grounds that it called for speculation. (Tr. at 652). Thus it is unclear from the transcript where Berry's trial counsel failed to object to inadmissible testimony, and how any failure to object so prejudiced Berry as to warrant a new trial.

{¶73} Finally, Berry argues that trial counsel filed premature and ineffective motions that provided the State more time to prepare for trial and tolled the running of speedy trial time. At the outset, it should be noted that a hearing was held on whether Berry's speedy trial rights had been violated approximately two weeks before the trial, and it was found that the trial was being held well within the allotted time. Next, it should be noted that Berry's trial counsel filed a motion to suppress a statement that Berry made to Carolyn Kuntz, a classification officer at the Corrections Center of Northwest Ohio, where Berry told yet another story, that Jonathan Gaines had killed New York. Rather than proceed on the matter, the State ultimately agreed not to present that testimony. So while the suppression motion might not have been "granted" on that issue, counsel was still able to "leverage" a motion to suppress into keeping out a statement that clearly would have been against Berry's interest for the jury to hear.

{¶74} Berry contends on appeal that counsel's premature and "ineffective" motions allowed the State more time to prepare for trial, but there is absolutely nothing in the record to establish that the State was not prepared for trial at any stage and that had Berry's counsel not filed any of the motions that he filed the State would have been unable to secure the same witnesses and exhibits used against him. Thus even if there was error in filing any of the motions, Berry is completely unable to establish any prejudice, as any claims that the State would not have been prepared are entirely speculative.

{¶75} Having found no errors by counsel and no prejudice to Berry, Berry's third assignment of error is overruled.

{¶76} For the foregoing reasons, Berry's assignments of error are overruled and the judgment of the Defiance County Common Pleas Court is affirmed.

*Judgment Affirmed*

**PRESTON, P.J. and ROGERS, J., concur.**

**/jlr**