[Cite as *In re G.F.*, 2024-Ohio-5366.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

IN RE:                                                    CASE NO. 13-24-01

    G.F.,

ADJUDICATED DELINQUENT CHILD.            O P I N I O N

IN RE:                                                    CASE NO. 13-24-02

    G.F.,

ADJUDICATED DELINQUENT CHILD.            O P I N I O N

**Appeals from Seneca County Common Pleas Court**
**Juvenile Division**
**Trial Court Nos. 22320312 and 22320369**

**Judgments Affirmed**

**Date of Decision:  November 12, 2024**

**APPEARANCES:**

    *Timothy J. Hoover* **for Appellant**

    *Eleanor J. Anderson* **for Appellee**

**ZIMMERMAN, J.**

{¶1} Appellant, G.F., appeals the December 20, 2023 judgment entries of the Seneca County Court of Common Pleas, Juvenile Division, adjudicating G.F. to be a delinquent child. For the reasons set forth below, we affirm.

{¶2} On September 20, 2023, a complaint was filed in the Seneca County Common Pleas Court, Juvenile Division, alleging G.F., a 15-year-old minor, to be a delinquent child for his commission of domestic violence in violation of R.C. 2919.25(A), a first-degree misdemeanor if committed by an adult.

{¶3} On November 17, 2023, a second complaint was filed in the juvenile court alleging G.F. to be a delinquent child for his commission of disorderly conduct at his school in violation of R.C. 2917.11(A)(1)(E)(3)(b), a fourth-degree misdemeanor if committed by an adult.

{¶4} Both cases proceeded to adjudication on December 6, 2023.[1] Thereafter, on December 20, 2023, the juvenile court rendered its decisions. In the domestic-violence case, the juvenile court found beyond a reasonable doubt that G.F. committed domestic violence and adjudicated him a delinquent child. Similarly, in the disorderly-conduct case, the juvenile court found beyond a

---

[1] A third case involving G.F. was before the juvenile court on December 6, 2023. In the third case, G.F. entered an admission to a charge of assault that took place on June 27, 2023. The juvenile court found beyond a reasonable doubt that G.F. committed assault and adjudicated him a delinquent child. The assault adjudication is not part of this appeal.

reasonable doubt that G.F. committed disorderly conduct and adjudicated him a delinquent child.

{¶5} Both cases proceeded to disposition on January 10, 2024. In both cases, the juvenile court ordered G.F. to serve 90 days in the Seneca County Youth Center, suspended upon various conditions.[2]

{¶6} On January 19, 2024, G.F. filed a notice of appeal in each case. G.F. raises two assignments of error for our review. We will address the assignments of error together.

### First Assignment of Error

**The trial court's adjudication for disorderly conduct was not supported by sufficient evidence.**

### Second Assignment of Error

**The trial court's adjudications for disorderly conduct and domestic violence were against the manifest weight of the evidence.**

{¶7} In his first and second assignments of error, G.F. argues that his adjudication for disorderly conduct is based on insufficient evidence and is against the manifest weight of the evidence. In particular, G.F. argues that the State presented insufficient evidence to show that he used "fighting words" or "threatening" conduct necessary to commit the offense of disorderly conduct. (Appellant's Brief at 11). G.F. further argues that his disorderly-conduct

---

[2] The dispositional orders were entered on January 16, 2024.

adjudication is against the manifest weight of the evidence because the "more persuasive" evidence demonstrated his "peaceful character." (*Id.* at 12, 13).

**{¶8}** Additionally, in his second assignment of error, G.F. argues that his domestic-violence adjudication is against the manifest weight of the evidence because the State failed to prove beyond a reasonable doubt that he did not act in self-defense when he punched his father.

*Standard of Review*

**{¶9}** Initially, we note that the "'standards for evaluating the weight and sufficiency of the evidence in juvenile adjudications are the same as the standards used in adult criminal cases.'" *In re J.D.*, 2023-Ohio-250, ¶ 57 (3d Dist.), quoting *In re A.K.*, 2021-Ohio-4199, ¶ 22 (1st Dist.). Moreover, manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). Thus, we address each legal concept separate.

**{¶10}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 (1997), fn. 4. Accordingly, "[t]he relevant inquiry is whether, after viewing the

-4-

evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks*, 61 Ohio St.3d at paragraph two of the syllabus.

{¶11} "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 2013-Ohio-4775, ¶ 33 (1st Dist.). *See also State v. Berry*, 2013-Ohio-2380, ¶ 19 (3d Dist.) ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence.").

{¶12} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

{¶13} When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,'

should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.

*Sufficiency-of-the-Evidence Analysis*

{¶14} G.F. was adjudicated a delinquent child for committing disorderly conduct at his school in violation of R.C. 2917.11(A)(1)(E)(3)(b). In relevant part, the disorderly-conduct statute provides that "[n]o person shall recklessly cause inconvenience, annoyance, or alarm to another by . . . [e]ngaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior." R.C. 2917.11(A)(1). Moreover, when disorderly conduct "is committed in the vicinity of a school," the offense is a fourth-degree misdemeanor if committed by an adult. R.C. 2917.11(E)(3)(b).

{¶15} On appeal, G.F. argues that his disorderly-conduct adjudication is based on insufficient evidence because he did not use "fighting words" or engage in "threatening" conduct at the school. (Appellant's Brief at 11). G.F. concedes that he "used profanity in the presence of [a school] administrator" and "did not initially follow directions." (*Id.* at 8). Nevertheless, G.F. asserts that the school administrator escalated the situation by contacting law enforcement for assistance. (*Id.*).

{¶16} Based on our review of the record, we conclude that the State presented sufficient evidence to show that G.F. recklessly caused inconvenience, annoyance, or alarm by engaging in violent or turbulent behavior at the school.

Specifically, the State presented the testimony of a school administrator. The school administrator testified that, on the day of the incident, he was covering the last period of the day for a teacher who had to leave school early. G.F. was in the classroom and had his sweatshirt hood up over his head in violation of school policy. The administrator told G.F. to put his hood down. G.F. yelled, "No." Ultimately, G.F. put his hood down and the administrator asked G.F. to step out into the hallway.

{¶17} While in the hallway, the administrator attempted to talk with G.F. about following school policy and directives. The administrator testified that G.F. seemed very upset. G.F. told the administrator that he did not like his tone and that the administrator was making him mad. G.F. also used profane language directed at the administrator. The administrator testified that G.F.'s aggressive demeanor made him nervous and fear for his safety.

{¶18} Due to G.F.'s conduct, the administrator radioed the school resource officer—who is also a deputy sheriff with the Seneca County Sheriff's Department—for assistance. G.F. again told the administrator that he was making him mad. G.F. stated he was going to tell his mom.

{¶19} At this point, the end-of-the-day bell rang and students started to exit the school building. While walking out of the building, G.F. turned around and said to the administrator, "[B]ig fucking mistake, sir. Big fucking mistake." (Dec. 6, 2023 Tr. at 70). The administrator headed to his office to find the school resource officer. The administrator heard someone coming down the hall and turned to see

-7-

G.F. running at him.  As G.F. was running, G.F. asked the administrator his name. After the administrator gave his name and stated that he was the school's assistant director, G.F. reiterated, "[B]ig fucking mistake."  (*Id.*).  G.F. added, "[Y]ou don't know what I can do."  (*Id.*).  The administrator testified that G.F.'s parting words to him were, "[Y]ou're done."  (*Id.* at 79).

{¶20} G.F. then exited the school building and boarded a bus.  Shortly thereafter, the school resource officer arrived at the school.  The resource officer located G.F. on the bus and directed him to exit the bus for a discussion.  The resource officer testified that G.F. appeared very distraught and nervous.  G.F. told the resource officer that he had a verbal altercation with the school administrator and that G.F. felt disrespected.

{¶21} After several minutes of talking, the school administrator approached G.F. and the resource officer and G.F.'s demeanor changed.  G.F. became very aggressive and started yelling profanities at the administrator.  The resource officer testified that G.F. started yelling, "[Y]ou don't know who the 'F' I am.  Get away from me.  Get this guy away from me."  (Dec. 6, 2023 Tr. at 33).  The resource officer further testified that G.F. displayed "[a]lmost an attack stance" by "clenching his fists" and "rubbing his fists together."  (*Id.*).  The resource officer expressed concern regarding G.F. "potentially going into a violent manner."  (*Id.* at 34).  G.F.'s conduct made the resource officer "a little uneasy that day."  (*Id.* at 44).

{¶22} In addition to the testimonial evidence, the State played a school surveillance video of the interactions between G.F. and the administrator while inside the school building. In particular, the video footage shows G.F.'s conduct in the hallway before the end-of-the-day bell rang, as well as his conduct in running back into the building to ask the administrator his name. Even though the video footage lacks audio, G.F.'s heightened demeanor throughout both interactions is evident.

{¶23} Furthermore, the school administrator testified that G.F.'s conduct caused inconvenience, annoyance, and alarm because the situation occurred at the end of the day while students were exiting the school building. Moreover, the administrator testified that, in his 25 years of working in education, he had never seen a student's demeanor heighten so quickly such that it caused him to be nervous and fear for his safety and for the safety of the other students.

{¶24} Accordingly, after viewing the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could have found beyond a reasonable doubt that G.F. recklessly caused inconvenience, annoyance, or alarm by engaging in violent or turbulent behavior at the school. Therefore, G.F.'s disorderly-conduct adjudication is based on sufficient evidence.

*Manifest-Weight-of-the-Evidence Analysis*

{¶25} Having concluded that G.F.'s disorderly-conduct adjudication is based on sufficient evidence, we next review whether G.F.'s adjudications are against the

manifest weight of the evidence. We will begin our manifest-weight review by addressing G.F.'s disorderly-conduct adjudication first, followed by his domestic-violence adjudication.

*Disorderly-Conduct Adjudication*

**{¶26}** On appeal, G.F. argues that his disorderly-conduct adjudication is against the manifest weight of the evidence because he and other witnesses testified to his "peaceful character." (Appellant's Brief at 13). G.F. further argues that the evidence showed that he is a special-needs student "who was historically well-behaved." (*Id.* at 12). According to G.F., the administrator's testimony is "suspect and unpersuasive." (*Id.* at 13). G.F. contends that "there are too many motives for the administrator to lie (like losing his job or teaching credentials altogether)." (*Id.*). Thus, G.F. asserts that the administrator's testimony should be disregarded as lacking credibility.

**{¶27}** When considering the credibility of witnesses in a manifest-weight challenge, we have acknowledged that ""the determination regarding witness credibility rests primarily with the trier of fact because the trier of fact is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections—observations that are critical to determining a witness's credibility."" *State v. Sheldon*, 2019-Ohio-4123, ¶ 45 (3d Dist.), quoting *State v. Bentz*, 2017-Ohio-5483, ¶ 98 (3d Dist.), quoting *State v. Williams*, 2013-Ohio-573, ¶ 31 (8th Dist.). Moreover, "nonverbal information, incapable of being transcribed into the

record by the court stenographer, significantly influences the fact finder's determinations." *State v. Evans*, 67 Ohio St.3d 405, 411 (1993). "'Thus, the decision whether, and to what extent, to believe the testimony of each witness is within the province of the factfinder.'" *Sheldon* at ¶ 45, quoting *In re D.L.*, 2012-Ohio-1796, ¶ 32 (3d Dist.). Therefore, we will not second guess a "'witness-credibility determination unless it is clear that the [factfinder] lost its way and a miscarriage of justice occurred.'" *Sheldon* at ¶ 45, quoting *State v. Thompson*, 2018-Ohio-637, ¶ 109 (3d Dist.).

{¶28} Here, the juvenile court considered the testimony of all the witnesses and found each witness to be credible—with the exception of G.F. In particular, the juvenile court believed the school administrator's testimony that G.F. engaged in turbulent behavior by acting angrily, aggressively, and in a threatening manner that caused inconvenience, annoyance, and alarm. Moreover, the juvenile court determined that the video evidence of the interactions between G.F. and the administrator inside the school building confirmed the administrator's testimony regarding G.F.'s heightened demeanor.

{¶29} It was well within the province of the juvenile court to determine G.F.'s credibility in recounting his interactions with the school administrator, including the prerogative to find G.F.'s testimony not to be credible. *See Sheldon*, 2019-Ohio-4123, at ¶ 45 (3d Dist.). After reviewing the entire record, we conclude that G.F. presents no compelling reason for this court to reject the juvenile court's

witness-credibility determination. Consequently, we conclude that G.F.'s disorderly-conduct adjudication is not against the manifest weight of the evidence.

*Domestic-Violence Adjudication*

**{¶30}** G.F. was adjudicated a delinquent child for committing domestic violence in violation of R.C. 2919.25(A), which provides that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." At trial, G.F. admitted to punching his father two or three times and causing his father's face to bleed.

**{¶31}** On appeal, G.F. argues that his domestic-violence adjudication is against the manifest weight of the evidence because he acted in self-defense when he punched his father. G.F. points out that only he and his father were in the car when the altercation took place. G.F.'s father was not able to testify as to what transpired due to his untimely death. Because G.F. testified that his father was the initial aggressor, G.F. contends that the State failed to meet its burden to prove beyond a reasonable doubt that G.F. did not act in self-defense.

**{¶32}** To establish a self-defense claim, a defendant must introduce evidence showing:

> "(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger."

-12-

*State v. Messenger*, 2022-Ohio-4562, ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). Moreover, if evidence is presented that tends to support that the defendant used force in self-defense, "the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense." R.C. 2901.05(B)(1). Thus, the State has the burden to show beyond a reasonable doubt that the defendant was not acting in self-defense. *See Messenger* at ¶ 27 (concluding that the prosecution's burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to manifest-weight review on appeal).

{¶33} Here, G.F. testified that the altercation took place while his father was driving and G.F. was in the passenger seat. G.F. testified that his father started "acting crazy" and grabbed G.F.'s hair with one hand—yanking him back and forth—and hitting G.F. on the top of the head and neck with the other hand. (Dec. 6, 2023 Tr. at 253). G.F. testified that his father continued driving while pulling G.F.'s hair and hitting him.

{¶34} At some point, G.F. started to punch his father. G.F. testified, "I didn't stop punching him until he let go of me." (*Id.* at 256). G.F. further testified that he hit his father two or three times and that the punches caused his father's face to bleed. After the father let go of G.F., "the car came to a stop" and both G.F. and his father got out of the car. (*Id.* at 257). G.F. testified that he and his father yelled at each other outside of the car. Eventually, they both got back into the car and

continued to yell. G.F. testified that he did not hit his father after they got back into the car.

{¶35} In contrast to G.F.'s testimony, the State presented the testimony of an eye witness to the altercation. Notably, the eye witness testified that she saw G.F. hit his father several times over a period of three to four minutes. The eye witness was able to view the altercation through an open window in her home, about 20 feet away from the parked car. The eye witness testified that she never saw the father hit G.F. According to the eye witness, "[A]ll I seen was [the father] getting his butt handed to him. He was getting beat very badly." (Dec. 6, 2023 Tr. at 210). The eye witness called the police to report the altercation.

{¶36} Based on our review of the record, we conclude that the juvenile court did not lose its way in rejecting G.F.'s self-defense claim. Indeed, it was well within the province of the juvenile court to determine the eye witness's credibility in recounting what she saw on the day of the altercation, including the prerogative to find the eye witness's testimony to be credible. *See Sheldon*, 2019-Ohio-4123, at ¶ 45 (3d Dist.). Moreover, it was within the juvenile court's prerogative to find G.F's version of events—including his self-defense claim—not to be truthful. Accordingly, G.F.'s domestic-violence adjudication is not against the manifest weight of the evidence.

{¶37} G.F.'s first and second assignments of error are overruled.

{¶38} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgments of the trial court.

***Judgments Affirmed***

**WALDICK and MILLER, J.J., concur.**

**/hls**