[Cite as *State v. Sheldon*, 2019-Ohio-4123.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HARDIN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,          CASE NO. 6-18-07

    v.

GERRICK ANTHONY SHELDON,       O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Hardin County Common Pleas Court
Trial Court No. CRI 2017 2116

**Judgment Affirmed**

**Date of Decision: October 7, 2019**

APPEARANCES:

    *Todd A. Workman* for Appellant

    *Jason M. Miller* for Appellee

Case No. 6-18-07

**ZIMMERMAN, P.J.**

{¶1} Defendant-appellant, Gerrick Anthony Sheldon ("Sheldon"), appeals the May 9, 2018 judgment entry of sentence of the Hardin County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} This case stems from the August 12-13, 2017 foiled plan of Sheldon to have his minor son, G.E.S., start a fire in the dryer vent of the residence of Sheldon's estranged wife, D.S., in order to cause her death.[1][2] At the time Sheldon solicited G.E.S. to start the fire, D.S.'s son, G.N.S., was residing (and was present) at the residence.[3]

{¶3} On August 23, 2017, the Hardin County Grand Jury indicted Sheldon on fifteen counts: Counts One and Two of complicity to attempted aggravated murder in violation of R.C. 2923.03(A)(1), (4), (C), 2923.02(A), and 2903.01(A), first-degree felonies; Counts Three and Four of complicity to attempted aggravated arson in violation of R.C. 2923.03(A)(1), (4), (C), 2923.02(A), and 2909.02(A)(1), second-degree felonies; Counts Five and Six of complicity to attempted aggravated arson in violation of R.C. 2923.03(A)(1), (4), (C), 2923.02(A), and 2909.02(A)(2), second-degree felonies; Counts Seven, Eight, Nine, and Ten of complicity to attempted aggravated burglary in violation of R.C. 2923.03(A)(1), (4), (C),

---

[1] D.S. is the stepmother of G.E.S.
[2] Sheldon also solicited his minor son, T.S., to start the fire; however, T.S. refused. (Mar. 27, 2018 Tr., Vol. IIA, at 505-506).
[3] Sheldon is the stepfather of G.N.S.

2923.02(A), and 2911.11(A)(2), second-degree felonies; Count Eleven of complicity to unlawful possession of dangerous ordnance in violation of R.C. 2923.03(A)(1), (4) and 2923.17(A), a fifth-degree felony; Count Twelve of complicity to possessing criminal tools in violation of R.C. 2923.03(A)(1), (4) and 2923.24(A), a fifth-degree felony; Count Thirteen of complicity to violating a protection order in violation of R.C. 2923.03(A)(1), (4) and 2919.27(A)(2), (B)(4), a third-degree felony; and Counts Fourteen and Fifteen of endangering children in violation of R.C. 2919.22(A), first-degree misdemeanors. (Doc. No. 3).[4] On August 29, 2017, Sheldon appeared for arraignment and entered pleas of not guilty. (Doc. No. 12).

{¶4} The case proceeded to a jury trial on March 26-30 and April 2-3, 2018. (Doc. No. 137). On April 3, 2018, the jury found Sheldon guilty of Counts One, Two, Three, Four, Five, Six, Eleven, Twelve, Thirteen, and Fourteen, but not guilty of Count Fifteen of the indictment. (Doc. Nos. 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 137).[5]

{¶5} On May 1, 2018, the trial court sentenced Sheldon to 7 years on Counts One and Two, respectively; 36 months on Count Five; 12 months on Count Eleven;

---

[4] On February 1, 2018, Counts One and Two of the indictment were amended to correct a clerical error. (Doc. No. 45). (*See also* Doc. No. 43).
[5] At the end of the presentation of all evidence, Sheldon moved for a Crim.R. 29 judgment of acquittal, which the trial court granted as to Counts Seven, Eight, Nine, and Ten. (Doc. No. 137).

24 months on Count Thirteen; and 180 days on Court Fourteen.  (Doc. No. 141).[6]

For purposes of sentencing, the trial court merged Counts One and Three, Counts Two and Four, Counts Five and Six, and Counts Eleven and Twelve.  (*Id.*).  The prison terms imposed by the trial court were ordered to be served consecutively for an aggregate sentence of 20 years in prison.  (*Id.*).  The trial court filed its judgment entry of sentence on May 9, 2018.  (*Id.*).

{¶6} Sheldon filed his notice of appeal on June 5, 2018 and raises three assignments of error for our review.  (Doc. No. 145).

## Assignment of Error No. I

**The evidence presented by the State was insufficient to support findings of guilt and findings of guilt were against the manifest weight of the evidence presented.**

{¶7} In his first assignment of error, Sheldon argues that his convictions are based on insufficient evidence and are against the manifest weight of the evidence. In particular, he argues that the State presented insufficient evidence that he:  (1) was complicit in the attempted aggravated murders of D.S. and G.N.S.; (2) was complicit in the attempted aggravated arson of the residence located at 13912 County Road 60 in Dunkirk, Ohio; (3) was complicit in the unlawful possession of dangerous ordnance;  (4) was complicit in possessing criminal tools; (5) was

---

[6] Although Counts Five and Six of the indictment identify the charged offenses as second-degree felonies, the degree of the offenses was amended at sentencing to third-degree felonies.  (*See* Oct. 29, 2018 Tr. at 8). (*See also* Doc. No. 141).  The trial court imposed a sentence on the non-merged complicity-to-attempted-aggravated-arson conviction as a third-degree felony.  (Doc. No. 141).  (*See also* Oct. 29, 2018 Tr. at 66).

complicit in violating a protection order; and (6) endangered children. Moreover, Sheldon argues that his convictions are against the manifest weight of the evidence because G.E.S.'s testimony was not credible.

*Standard of Review*

**{¶8}** Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). Thus, we address each legal concept individually.

**{¶9}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89, 102 (1997), fn. 4. Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.).

*See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *Thompkins* at 386.

{¶10} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

*Sufficiency of the Evidence*

{¶11} As an initial matter, although Sheldon challenges the sufficiency and the weight of the evidence supporting the jury's findings of guilt as to the

complicity-to-attempted-aggravated-arson charges under Counts Three, Four, and Six of the indictment and as to the complicity-to-possessing-criminal-tools charge under Count Twelve, we need not address those arguments. *See State v. Turner*, 2d Dist. Clark No. 2017-CA-78, 2019-Ohio-144, ¶ 22, citing *State v. Croom*, 7th Dist. Mahoning No. 12 MA 54, 2013-Ohio-5682, ¶ 60-61 and *State v. Zimmer*, 8th Dist. Cuyahoga No. 104946, 2017-Ohio-4440, ¶ 9, quoting *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14. Specifically, "[w]hen counts in an indictment are allied offenses, and there is sufficient evidence to support the offense on which the state elects to have the defendant sentenced, the appellate court need not consider the sufficiency [or weight] of the evidence on the count that is subject to merger because any error would be harmless" beyond a reasonable doubt. *Ramos* at ¶ 14, citing *State v. Powell*, 49 Ohio St.3d 255, 263 (1990), *superseded by state constitutional amendment on other grounds*, *Smith*, 80 Ohio St.3d at 102, fn. 4.[7] *See State v. Henderson*, 7th Dist. Mahoning No. 15 MA 0137, 2018-Ohio-5123, ¶ 9 ("Courts have held, in merged offense cases, where there is sufficient evidence

---

[7] The Eighth District Court of Appeals expressed concern with the blind application of this principle and hypothesized that there could be a circumstance under which a challenge to an offense that is merged for purposes of sentencing would not be harmless beyond a reasonable doubt. *See State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 17. However, the Eighth District ultimately determined that it need not reach that issue in *Ramos* after reasoning that, "[f]or purposes of this appeal, our conclusion that the state offered legally sufficient evidence to prove the aggravated murder conviction renders our hypothetical moot." *Id.* at ¶ 18. Similarly, because we ultimately conclude that Sheldon's attempted-complicity-to-aggravated-murder convictions under Counts One and Two; attempted-complicity-to-aggravated-arson conviction under Count Five; and complicity-to-possession-of-dangerous-ordnance under Count Eleven are based on sufficient evidence and are not against the manifest weight of the evidence, we need not reach that issue in this case.

supporting the conviction of the state's elected offense for sentencing, it is harmless error if there was insufficient evidence to support the offenses that merged with the elected offense."), citing *State v. Worley*, 8th Dist. Cuyahoga No. 103105, 2016-Ohio-2722, ¶ 23, citing *Powell* at 263 (concluding that "[e]ven if evidence of kidnapping by restraint was insufficient to support conviction, the fact that the kidnapping by removal was based on sufficient evidence and merged with the kidnapping by restraint count means any error with the conviction was harmless beyond a reasonable doubt"), and citing *Croom* at ¶ 60-61 ("The Supreme Court has concluded that, even if there is insufficient evidence to support one count, where that count has been merged with another count, the error in rendering a verdict on that count is harmless beyond a reasonable doubt."), citing *Powell* at 263, and citing *State v. Washington*, 10th Dist. Franklin No. 09AP-424, 2009-Ohio-6665, ¶ 18. *See also Henderson* at ¶ 9 (applying this rationale to manifest-weight-, jury-instruction-, and indictment-related arguments), citing *State v. Springer*, 8th Dist. Cuyahoga No. 104649, 2017-Ohio-8861, ¶ 15, *Ramos* at ¶ 14, and *State v. Franks*, 8th Dist. Cuyahoga No. 103682, 2016-Ohio-5241, ¶ 18.

{¶12} In this case, error, if any, with respect to the sufficiency or weight of the evidence as to Sheldon's complicity-to-attempted-aggravated-arson charges under Counts Three, Four, and Six or as to his complicity-to-possessing-criminal-tools charge under Count Twelve is harmless beyond a reasonable doubt because

those counts were merged with Counts One, Two, and Five, and Count Eleven, respectively. *See Ramos* at ¶ 13 ("Error, if any, with respect to the sufficiency of the evidence on the felonious assault, domestic violence, and kidnapping counts is harmless because those counts were merged into the life sentence imposed for aggravated murder under Count 2."). In other words, Sheldon was not *convicted* of those offenses because the trial court merged those offenses for purposes of sentencing. *See Turner* at ¶ 22 ("'A conviction does not exist where there has been a guilty verdict * * * but no sentence.'"), quoting *Croom* at ¶ 59, citing *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, ¶ 12. *See also Ramos* at ¶ 16 (noting that "a second line of thought has developed" suggesting that "if a sentence for an allied offense was merged into another sentence, the defendant was not actually 'convicted' of the allied offense"), citing *State v. Obsaint*, 1st Dist. Hamilton No. C-060629, 2007-Ohio-2661, ¶ 24. Indeed, the Supreme Court of Ohio has explicitly stated that a "conviction" requires both a finding of guilt and a sentence. *Ramos* at ¶ 16, citing *State v. Henderson*, 58 Ohio St.2d 171, 178 (1979). For these reasons, we need not address any arguments challenging the sufficiency or weight of the evidence regarding Sheldon's complicity-to-attempted-aggravated-arson charges under Counts Three, Four, and Six or his complicity-to-possessing-criminal-tools charge under Count Twelve. *See Ramos* at ¶ 13, 18.

{¶13} Therefore, we will begin by addressing Sheldon's sufficiency-of-the-evidence argument as it relates to his complicity-to-attempted-aggravated-murder convictions, followed by his complicity-to-attempted-aggravated-arson conviction under Count Five of the indictment, and then his sufficiency-of the-evidence argument as it relates to his complicity-to-possession-of-dangerous-ordnance conviction. Finally, we will address Sheldon's sufficiency-of-the-evidence argument as it relates to his complicity-to-violating-a-protection-order and endangering-children convictions. *See State v. Velez*, 3d Dist. Putnam No. 12-13-10, 2014-Ohio-1788, ¶ 68, citing *State v. Wimmer*, 3d Dist. Marion No. 9-98-46, 1999 WL 355190, *1 (Mar. 26, 1999).

*Complicity to Attempted Aggravated Murder*

{¶14} Sheldon was convicted of complicity to attempted aggravated murder under R.C. 2923.03(A)(1), (4), (C), 2923.02(A), and 2903.01(A). R.C. 2923.03 sets forth the offense of complicity and provides, in its relevant part, as follows:

(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

(1) Solicit or procure another to commit the offense.

* * *

(4) Cause an innocent or irresponsible person to commit the offense.

* * *

(C) No person shall be convicted of complicity under this section unless an offense is actually committed, but a person may be convicted of complicity in an attempt to commit an offense in violation of section 2923.02 of the Revised Code.

R.C. 2923.03(A)(1), (4), (C). R.C. 2923.02, Ohio's attempt-crime statute, provides, in its relevant part, "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." R.C. 2923.02(A).[8]

{¶15} In this case, Sheldon was convicted of being complicit in the attempted aggravated murders of D.S. and G.N.S. Ohio's aggravated-murder statute, R.C. 2903.01, provides, in its relevant part, "No person shall purposely, and with prior calculation and design, cause the death of another * * *." R.C. 2903.01(A). Accordingly, the State was required to prove that Sheldon purposely (and with prior calculation and design) intended to cause the deaths of D.S. and G.N.S. and that he solicited or procured G.E.S. (or caused an innocent or irresponsible person—i.e., G.E.S.) to engage in conduct that (if successful) would have resulted in the deaths of D.S. and G.N.S.

{¶16} On appeal, Sheldon argues only that there is insufficient evidence that he acted with prior calculation and design and that the State presented insufficient

---

[8] We are applying the version of the Revised Code in effect at the time Sheldon committed the offenses.

evidence that "the plan if carried out successfully would have resulted in the offense of aggravated murder." (Appellant's Brief at 9-10). Because these are the only elements that Sheldon challenges on appeal, our sufficiency-of-the-evidence review will be the evidence supporting only the prior-calculation-and-design and attempt-crime elements.

R.C. 2903.01(A) employs

"the phrase, 'prior calculation and design,' to indicate an act of studied care in planning or analyzing the means of the crime, as well as a scheme compassing the death of the victim. Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, but they must be sufficient to meet the proposed test of 'prior calculation and design.'"

*State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, ¶ 17, quoting Ohio Legislative Service Commission, *Proposed Ohio Criminal Code: Final Report of the Technical Committee to Study Ohio Criminal Laws and Procedures*, at 71 (1971), and citing *State v. Taylor*, 78 Ohio St.3d 15, 18-19 (1997). *See also State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, ¶ 133 ("'Prior calculation and design' requires 'a scheme designed to implement the calculated decision to kill.'"), quoting *State v. Cotton*, 56 Ohio St.2d 8, 11 (1978). "The General Assembly has defined the mens rea of purpose, stating that '[a] person acts purposely when it is the person's specific intention to cause a certain result.'" *Id.*, quoting R.C. 2901.22(A). "Evidence of purpose, however, does not automatically mean that the element of prior calculation and design also exists." *Id.*, citing S*tate v. Campbell*,

90 Ohio St.3d 320, 341 (2000) (concluding that "purpose to kill is not the same thing as prior calculation and design and does not by itself satisfy the mens rea element of R.C. 2903.01(A)").

{¶17} "[T]he existence of prior calculation and design is determined on a case-by-case basis analysis of the facts and evidence." *State v. Harris*, 8th Dist. Cuyahoga No. 104329, 2017-Ohio-2751, ¶ 37, citing *State v. Jones*, 91 Ohio St.3d 335, 345 (2001). *See also Walker* at ¶ 19. "Although there is no bright-line test for determining prior calculation and design," the Supreme Court of Ohio has offered the following three factors to consider when determining whether the totality of the circumstances surrounding the murder suggest that the defendant acted with prior calculation and design: (1) "whether the accused and the victim knew each other" and, if so, whether their relationship was strained; (2) "whether there was thought or preparation in choosing the murder weapon or murder site"; and (3) "whether the act was 'drawn out' or 'an almost instantaneous eruption of events.'" *Id.*, quoting *Walker* at ¶ 20.

{¶18} In this case, the State presented sufficient evidence that Sheldon engaged in a scheme designed to kill D.S. and G.N.S. Sheldon and D.S., who were married to each other, were divorcing and were estranged at the time of the incident. (*See, e.g.*, Mar. 26, 2018 Tr., Vol. IA, at 258-260); (Mar. 28, 2018 Tr., Vol. III, at 671-673). D.S. testified that their divorce hearing was scheduled for September 19,

2017 and that Sheldon and she had not made any agreements as to the terms of their divorce as of the date of the August 12-13, 2017 incident. (Mar. 28, 2018 Tr., Vol. III, at 706-707, 760).

**{¶19}** Moreover, D.S. testified that their relationship was strained. *Compare State v. Miller*, 8th Dist. Cuyahoga No. 103591, 2016-Ohio-7606, ¶ 65 (discussing the strained relationship between Miller and his wife—the victim—in concluding that Miller's attempted-murder and attempted-aggravated-murder convictions were based on sufficient evidence). In particular, D.S. testified that she contacted the Hardin County Sheriff's Office several times prior to the (August 12-13, 2017) incident because Sheldon had "been to the house numerous times and caused damage to the house, broke in when [she] was there * * *." (Mar. 28, 2018 Tr., Vol. III, at 677).

**{¶20}** G.N.S., who resided with D.S., testified that his relationship with Sheldon was also strained. (Mar. 28, 2018 Tr., Vol. III, at 779-780). (*See also* Mar. 26, 2018 Tr., Vol. IA, at 276-277). Specifically, G.N.S. testified that (when Sheldon was still residing at the house) he was "a victim of * * * violence [by Sheldon] in the house." (Mar. 28, 2018 Tr., Vol. III, at 779-780).

**{¶21}** Furthermore, the evidence that the State presented at trial reflects that Sheldon's scheme was "drawn out" with thought and preparation in orchestrating the murder plan. Indeed, G.E.S. (who was 16 years old at the time of trial) testified

that Sheldon had been strategizing various plans to kill D.S. since (at the latest) July 4, 2017. (Mar. 26, 2018 Tr., Vol. IA, at 259). (*See also id.* at 312); (Mar. 27, 2018 Tr., Vol. IIA, at 565, 612-613). According to G.E.S., Sheldon mentioned "burning the house down" prior to the August 12-13, 2017 incident. (Mar. 26, 2018 Tr., Vol. IA, at 259). G.E.S. further testified that, on the evening of August 12, Sheldon "looked outside and he said it was a dark night, and he said it would be a good night to burn the house." (*Id.* at 255). First, Sheldon asked G.E.S.'s brother, T.S., if he would burn the house (who declined), then asked G.E.S. if he "knew anyone that would do it" and stated that he would "pay them if [he] had to." (Mar. 26, 2018 Tr., Vol. IA, at 255-257, 261); (Mar. 27, 2018 Tr., Vol. IIA, at 505). Because G.E.S. wanted to protect D.S. and G.N.S. from that possibility, he volunteered to burn the house (with the intent to foil the plan). (Mar. 26, 2018 Tr., Vol. IA, at 257, 260-262). (*See also* Mar. 27, 2018 Tr., Vol. IIA, at 507). Indeed, G.E.S. knew that D.S. obtained a protection order (protecting her from Sheldon) because Sheldon talked about the protection order. (Mar. 26, 2018 Tr., Vol. IA, at 273-274). (*See also* Mar. 28, 2018 Tr., Vol. III, at 681); (Mar. 28 Tr., Vol. IIIA, at 850); (State's Ex. 10).

{¶22} After G.E.S. seemingly volunteered, Sheldon began making the preparations to burn the house. (Mar. 26, 2018 Tr., Vol. IA, at 263). (*See also* Mar. 27, 2018 Tr., Vol. IIA, at 507-508); (Mar. 29, 2018 Tr., Vol. IV, at 1093). Specifically, he

> got up, he put his shoes on, he went out to the garage, and he started making the funnel. And, first, he syphoned out the gas, checked the lawn mower. The only one that had gas in it was the [zero-turn lawnmower].
>
> * * *
>
> [There] wasn't much [gas in the lawnmower], so he poured [gas from] a weed eater.

(Mar. 26, 2018 Tr., Vol. IA, at 262-263, 266); (State's Exs. 27, 32). Further, Sheldon constructed a "funnel system" in which he taped a hose to a funnel for G.E.S. to use as a conduit to funnel the gasoline into the house. (Mar. 26, 2018 Tr., Vol. IA, at 268-270); (State's Exs. 28, 29, 30).

{¶23} Sheldon placed the funnel system, a candle lighter, some newspaper, a pair of gloves, and the container of gasoline into a bag (the "kit") for G.E.S. to carry. (Mar. 26, 2018 Tr., Vol. IA, at 268, 271); (State's Exs. 23, 24, 25, 26). While Sheldon was assembling the materials, he began telling G.E.S. of his plan, which was for G.E.S. "to run to the back of the house by the dryer vent that comes out of the house" and "to shove * * * the funnel up into the thing, and * * * then after [he] pour[ed] all the gas in there, * * * shove the newspaper in there and light it, so it will catch." (Mar. 26, 2018 Tr., Vol. IA, at 290). Sheldon further instructed G.E.S. to light the fire through the dryer vent because it was "right beside" D.S.'s bedroom. (*Id.* at 291). Importantly, before leaving the house, Sheldon and G.E.S. tested the candle lighter to ensure that it worked. (*Id.* at 267). Lastly, Sheldon instructed

G.E.S. to wear dark clothing and "to get some gloves and a mask because they got [sic] cameras, and [Sheldon] knew they had cameras." (*Id.* at 263). (*See also id.* at 272).

**{¶24}** Thereafter, G.E.S. got into a vehicle with Sheldon, placing the "kit" between his feet, and Sheldon drove G.E.S. to the residence. (*Id.* at 264, 271, 322-323). According to G.E.S., they drove past the residence "about three times." (*Id.* at 271). "[T]he first time he was just seeing if anyone was up and * * * he came straight past it again in the same direction, and just making sure. And then he got down to the end of the road, and he stopped, and then he turned around and came back down." (*Id.* at 272). "[A]fter the third time, he went past the house a little bit, and there's this dirt path farmers use, he stopped * * * there, and [G.E.S.] had to run straight through the neighbor's yard." (*Id.* at 274-275). G.E.S. testified that—because D.S. and G.N.S. do not park their vehicles in a garage—he and Sheldon knew that D.S. and G.N.S. were home because they saw (as they were driving by) that their vehicles were parked in the driveway. (*Id.* at 313-314).

**{¶25}** Viewing this evidence from the lens of which we view the sufficiency of the evidence, we conclude that the State presented sufficient evidence that Sheldon acted with prior calculation and design in devising a scheme intended to kill D.S., and then by attempting to carry it out. Furthermore, this evidence is sufficient evidence that Sheldon acted with prior calculation and design as to G.N.S.

*Accord State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, ¶ 147; *State v. Wilson*, 8th Dist. Cuyahoga No. 104333, 2017-Ohio-2980, ¶ 65. "'The doctrine of transferred intent is firmly rooted in Ohio law.'" *Dean* at ¶ 136, quoting *State v. Sowell*, 39 Ohio St.3d 322, 332 (1988). *See also Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S.Ct. 602 (2005). "'"If one purposely causes the death of another and the death is the result of a scheme designed to implement the calculated decision to kill someone other than the victim, the offender is guilty of aggravated murder in violation of R.C. 2903.01(A)."'" *Dean* at ¶ 136, quoting *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 171, quoting *State v. Solomon*, 66 Ohio St.2d 214 (1981), paragraph one of the syllabus. *See also Wilson* at ¶ 64. The doctrine of transferred intent applies to attempted-murder charges because "[a] showing of harm is unnecessary since 'the intent is what is transferred, not the harm.'" *Dean* at ¶ 147, quoting *State v. Reese*, 1st Dist. Hamilton No. C-060576, 2007-Ohio-4319, ¶ 23. Stated another way, "[u]nder the law, the unintended victim is accorded the same protection as the intended victim." *Reese* at ¶ 23.

**{¶26}** Nevertheless, Sheldon contends that there is insufficient evidence that he acted with prior calculation and design because "[t]here was no credible testiony [sic] given as to the calculation and design element of the crime." (Appellant's Brief at 10). Sheldon's credibility argument is misplaced. "In assessing the sufficiency of the evidence, we do not resolve evidentiary conflicts or assess the credibility of

witnesses; rather, we determine if any rational trier of fact could have found the essential elements of [complicity to attempted aggravated murder] beyond a reasonable doubt when viewing the evidence in a light most favorable to the prosecution." *State v. Watts*, 3d Dist. Hancock No. 5-12-34, 2016-Ohio-257, ¶ 46, citing *Jenks*, 61 Ohio St.3d 259, at paragraph two of the syllabus and *Jones*, 2013-Ohio-4775, at ¶ 33.

**{¶27}** Next, Sheldon argues that his complicity-to-attempted-aggravated-murder convictions are based on insufficient evidence because the State did not present any evidence reflecting that the plan, if carried out successfully, would have resulted in the deaths of D.S. and G.N.S. We disagree. The State may establish the elements of a crime with direct or circumstantial evidence. *Miller*, 2016-Ohio-7606, at ¶ 60, citing *State v. Durr*, 58 Ohio St.3d 86, 92 (1991). "'Circumstantial evidence' is the 'proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning or other facts.'" *State v. Lawwill*, 12th Dist. Butler No. CA2007-01-014, 2008-Ohio-3592, ¶ 12, quoting *State v. Wells*, 12th Dist. Warren No. CA2006-02-029, 2007-Ohio-1362, ¶ 11, citing *State v. Griesheimer*, 10th Dist. Franklin No. 05AP-1039, 2007-Ohio-837, ¶ 26. Circumstantial evidence has no less probative value than direct evidence. *Griesheimer* at ¶ 26, citing *Jenks* at paragraph one of the syllabus. *See also State v. Heinish*, 50 Ohio St.3d 231, 238 (1990) ("This court has long held that circumstantial evidence is sufficient to sustain

a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt."); *Miller* at ¶ 61 (stating that "circumstantial evidence alone is sufficient to support a conviction"), citing *State v. Coleman*, 8th Dist. Cuyahoga No. 102966, 2016-Ohio-297, ¶ 22. "'[A]ll that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt.'" *Miller* at ¶ 61, quoting *Jenks* at 272. "'"Circumstantial evidence is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence."'" *Id.*, quoting *State v. Hawthorne*, 8th Dist. Cuyahoga No. 96496, 2011-Ohio-6078, ¶ 9, quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6 (1960).

**{¶28}** Sheldon contends that the State presented insufficient evidence reflecting "the ability of [the] plan to work" because

> [w]e are never told what the drier [sic] vent is made or [sic], whether or not it is flammable, or whether or not fire could be started in the vent and spread to the rest of the home resulting in a fire that could cause injury to its occupants.

(Appellant's Brief at 9-10). Sheldon's argument is misplaced. Instead, the jury could infer that starting a fire in an occupied structure (at nighttime), and in a room close to the intended victim's bedroom, is conduct that, if successful, could result in the victim's death. *See State v. Simpson*, 10th Dist. Franklin No. 01AP-757, 2002-Ohio-3717, ¶ 97. More plainly, the jury could infer that a fire would result from the combined use of a candle lighter, newspaper, and flammable liquid; that

fires spread in structures; and that fires cause harm, including death. *See State v. Abner*, 2d Dist. Montgomery No. 20661, 2006-Ohio-4510, ¶ 116. Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that Sheldon engaged in conduct that, if successful, would constitute or result in aggravated murder. For these reasons, Sheldon's complicity-to-attempted-aggravated-murder convictions are based on sufficient evidence.

*Complicity to Attempted Aggravated Arson*

{¶29} We also reject Sheldon's argument that his complicity-to-attempted-arson conviction under Count Five of the indictment is based on insufficient evidence. In addition to Ohio's complicity and attempt-crime statue that we previously identified, the arson offense of which Sheldon was convicted under Count Five provides, in its relevant part, "No person, by means of fire or explosion, shall knowingly * * * [c]ause physical harm to any occupied structure." R.C. 2909.02(A)(2).

> A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.

R.C. 2901.22(B). Because there is no statutory definition of "physical harm to a 'structure,'" courts turn to the statutory definition of "physical harm to property" in defining that element of aggravated arson. *State v. Fisher*, 8th Dist. Cuyahoga No. 83098, 2004-Ohio-3123, ¶ 21. *See State v. Mitchell*, 3d Dist. Marion No. 9-2000-

03, 2000 WL 1114848, *3-4 (Aug. 8, 2000). *See also Ohio Jury Instructions*, CR

Section 509.02 (Rev. May 2019).

> "Physical harm to property" means any tangible or intangible damage
> to property that, in any degree, results in loss to its value or interferes
> with its use or enjoyment. "Physical harm to property" does not
> include wear and tear occasioned by normal use.

R.C. 2901.01(A)(4). *See also* Baldwin's Ohio Practice Criminal Law, *Arson*,

Section 103:3 (3d Ed.) ("Aggravated arson also addresses 'physical harm to

property' but only in the limited category of occupied structures * * *."), citing R.C.

2909.02(A)(2), (3). Lastly,

> "Occupied structure" means any house, building, outbuilding,
> watercraft, aircraft, railroad car, truck, trailer, tent, or other structure,
> vehicle, or shelter, or any portion thereof, to which any of the
> following applies:
>
> (1)  It is maintained as a permanent or temporary dwelling, even
> though it is temporarily unoccupied and whether or not any person is
> actually present.
>
> (2)  At the time, it is occupied as the permanent or temporary
> habitation of any person, whether or not any person is actually present.
>
> (3)  At the time, it is specially adapted for the overnight
> accommodation of any person, whether or not any person is actually
> present.
>
> (4)  At the time, any person is present or likely to be present in it.

R.C. 2909.01(C).

{¶30} Thus, similar to Sheldon's complicity-to-attempted-aggravated-

murder convictions, the State was required to prove that Sheldon knowingly

solicited or procured G.E.S. (or caused an innocent or irresponsible person—i.e., G.E.S.) to engage in conduct that (if successful) would have resulted in physical harm to an occupied structure.

**{¶31}** Here, Sheldon offers a similar argument to the argument he posed regarding the sufficiency of the evidence supporting the attempt element of his complicity-to-attempted-aggravated-murder convictions. That is, he argues: (1) that the State "did not present any evidence as to the damaging effect of a fire placed in the dryer vent"; and (2) that the State did not present any evidence that Sheldon "would have any reason to know what damaging effect this half baked plan may have." (Appellant's Brief at 11). Since he challenges only the physical-harm-to-a-structure and standard-of-culpability elements of his complicity-to-attempted-aggravated-arson conviction under R.C. 2909.02(A)(2), we will address just those elements.

**{¶32}** Sheldon's arguments fail to consider (as we previously discussed) that the State may prove elements of criminal offenses by way of circumstantial evidence. *See Miller*, 2016-Ohio-7606, at ¶ 60, citing *Durr*, 58 Ohio St.3d at 92. Indeed, it is well established that circumstantial evidence is sufficient to sustain arson convictions because "[b]ased upon the very nature of the crime, proof of arson must, of necessity, often rely heavily on circumstantial evidence." *State v. Weber*, 124 Ohio App.3d 451, 462 (10th Dist.1997), citing *State v. Pruiett*, 9th Dist.

Summit. No. 12858, 1987 WL 9839, *1 (Apr. 15, 1987). *See State v. Simpson*, 7th Dist. Columbiana No. 01-CO-29, 2002-Ohio-5374, ¶ 47, citing *State v. Webb*, 8th Dist. Cuyahoga No. 72588, 1998 WL 338071, *3 (June 25, 1998), citing *State v. Zayed*, 8th Dist. Cuyahoga No. 71039, 1997 WL 450045, *3 (Aug. 7, 1997), *State v. Wills*, 120 Ohio App.3d 320, 330-332 (8th Dist.1997), *Weber* at 462, *State v. Alba*, 6th Dist. Sandusky No. S-94-018, 1995 WL 326394, *7 (June 2, 1995), and *State v. Wright*, 3d Dist. Crawford No. 3-92-24, 1994 WL 725919, *2 (Dec. 30, 1994).

{¶33} Accordingly, the jury could infer that there would be a damaging effect to the house from a fire placed in a dryer vent. That is, the jury could infer that a fire placed in a dryer vent would result in any tangible or intangible damage to the residence, which would result, in any degree, in a loss to its value or would interfere with the use or enjoyment of the residence. *See State v. Sheline*, 8th Dist. Cuyahoga No. 106649, 2019-Ohio-528, ¶ 93 (concluding that "it would be ludicrous to suggest that a fire [would] not result in loss to the value of the victim's house [or] did not interfere with the use or enjoyment of the house"). *See also State v. Dixon*, 5th Dist. Stark No. 2013 CA 00003, 2013-Ohio-4149, ¶ 44; *Mitchell*, 2000 WL 1114848, at *3-4. Thus, the State presented sufficient evidence of the physical-harm-to-a-structure element.

{¶34} Further, the State presented sufficient evidence that Sheldon was aware that starting a fire in a dryer vent of an occupied structure would probably cause physical harm to that structure. "'The element of knowledge required for a finding of aggravated arson can be established by circumstantial evidence.'" *State v. Worthy*, 11th Dist. Lake No. 2004-L-137, 2005-Ohio-5871, ¶ 35, quoting *State v. Hoak*, 9th Dist. Lorain No. 94-CA00-59-17, 1995 WL 471383, *4 (Aug. 9, 1995), and citing *Simpson* at ¶ 48. Thus, "[a] jury is permitted to find that a defendant intended the natural, reasonable and probable consequences of his or her voluntary acts." *State v. Taylor*, 7th Dist. Jefferson No. 98-JE-31, 2001 WL 118956, *3 (Feb. 9, 2001), citing *State v. Carter*, 72 Ohio St.3d 545, 554 (1995) and *Sandstrom v. Montanta*, 442 U.S. 510, 517, 99 S.Ct. 2450 (1979). Accordingly, "[i]ntent can be determined from surrounding facts and circumstances." *Id.*, citing *State v. Johnson*, 56 Ohio St.2d 35, 38 (1978).

{¶35} In this case, the State presented evidence that Sheldon instructed G.E.S. to pour gasoline—a flammable liquid—inside the dryer vent (by way of a funnel system), then ignite the liquid by setting fire to newspaper (a material typically used to start fires) and "shov[ing]" the newspaper into the dryer vent. To ensure the success of his plan, Sheldon tested the candle lighter that he provided G.E.S. prior to leaving his residence. Based on this evidence, the jury could infer that Sheldon was aware that starting a fire in the dryer vent would probably cause

physical harm to the residence. *See Simpson* at ¶ 48. Therefore, we conclude that the State presented sufficient evidence that Sheldon committed the crime of complicity to attempted aggravated arson.

*Complicity to Unlawful Possession of Dangerous Ordnance*

**{¶36}** Next, we will address the sufficiency of the evidence supporting Sheldon's complicity-to-unlawful-possession-of-dangerous-ordnance conviction. We previously defined Ohio's complicity statute. R.C. 2923.17, Ohio's unlawful-possession-of-dangerous-ordnance statute, provides that "[n]o person shall knowingly acquire, carry, or use any dangerous ordnance." R.C. 2923.17(A). Knowingly has the same definition as it was defined in conjunction with our analysis of Sheldon's complicity-to-attempted-aggravated-arson conviction. "Dangerous ordnance" means, in relevant part, "[a]ny explosive device or incendiary device." R.C. 2923.11(K)(2). An "incendiary device" is defined as "any firebomb, and any device designed or specially adapted to cause physical harm to persons or property by means of fire, and consisting of an incendiary substance or agency and a means to ignite it." R.C. 2923.11(I).

**{¶37}** On appeal, Sheldon contends only that the State presented insufficient evidence that he knowingly possessed dangerous ordnance because "the possession of gasoline in a gallon jug does not fit within the definition of dangerous ordinance [sic] * * *." (Appellant's Brief at 11). This argument is feckless. A plastic

container filled with gasoline—coupled with the means to ignite the gasoline—constitutes an incendiary device within the meaning of R.C. 2923.11(I) and is thus dangerous ordnance under R.C. 2923.13(A). *See State v. McCall*, 99 Ohio App.3d 409, 412 (9th Dist.1994). The State presented evidence that the "kit" (as assembled by Sheldon for G.E.S. to start the fire) contained a plastic container filled with gasoline, newspaper, and a working candle lighter. *See State v. Taylor*, 9th Dist. Lorain No. 06CA009000, 2008-Ohio-1462, ¶ 68. Therefore, Sheldon's complicity-to-unlawful-possession-of-dangerous-ordnance conviction is based on sufficient evidence.

### Complicity to Violating a Protection Order and Endangering Children

{¶38} Finally, we will address the sufficiency of the evidence supporting Sheldon's complicity-to-violating-a-protection-order and endangering-children convictions. Sheldon argues that his complicity-to-violating-a-protection-order conviction is based on insufficient evidence because "[t]here is nothing in [R.C. 2919.27] that refers to an agent and their ability to violate the protection order on behalf of a principal." (Appellant's Brief at 13). And, Sheldon argues that his endangering-children conviction is based on insufficient evidence because G.E.S. "volunteered for the task * * *." (Appellant's Brief at 14).

{¶39} In addition to Ohio's complicity statute, the State was required to establish the elements of the crime of violating a protection order under R.C.

2919.27. That statute provides, in its relevant part, that "[n]o person shall recklessly violate the terms of" "[a] protection order issued pursuant to section 2151.34, 2903.213, or 2903.214 of the Revised Code."  R.C. 2919.27(A)(2).

> A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature.  A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

R.C. 2901.22(C).

{¶40} The criminal offense of endangering children is codified in R.C. 2919.22, which provides, in its relevant part:

> No person, who is the parent * * * of a child under eighteen years of age * * *, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support."

R.C. 2919.22(A).  The phrase "substantial risk" in R.C. 2919.22(A) "means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist."  R.C. 2901.01(A)(8).  The Supreme Court of Ohio concluded that recklessness (as defined in R.C. 2901.22(C)) is an essential element of the crime of endangering children under R.C. 2919.22(A). *State v. McGee*, 79 Ohio St.3d 193 (1997), syllabus.  "Thus, to support a conviction for child endangering under R.C. 2919.22(A), it must be established, beyond a reasonable doubt, that [Sheldon] (1) recklessly (2) created a substantial risk to the

health or safety of one or more of [his] children (3) by violating a duty of care, protection or support." *State v. Norris*, 9th Dist. Lorain No. 14CA010699, 2015-Ohio-5180, ¶ 15.

**{¶41}** In these arguments, Sheldon failed to present any citations to case law or statues in support of his assertions. *See State v. Stevens*, 3d Dist. Allen No. 1-14-58, 2016-Ohio-446, ¶ 81; *State v. Russell*, 9th Dist. Summit No. 25154, 2010-Ohio-5466, ¶ 17. "[A] defendant has the burden of affirmatively demonstrating the error of the trial court on appeal." *State v. Stelzer*, 9th Dist. Summit No. 23174, 2006-Ohio-6912, ¶ 7, citing *State v. Cook*, 9th Dist. Summit No. 20675, 2002-Ohio-2646, ¶ 27. "Moreover, '[i]f an argument exists that can support this assignment of error, it is not this court's duty to root it out.'" *Id.*, quoting *Cook* at ¶ 27.

**{¶42}** "App.R. 12(A)(2) provides that an appellate court 'may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A).'" *State v. Jackson*, 10th Dist. Franklin No. 14AP-670, 2015-Ohio-3322, ¶ 11, quoting App.R. 12(A)(2). "Additionally, App.R. 16(A)(7) requires that an appellant's brief include '[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, *with citations to the authorities, statutes*, and parts of the record on

which appellant relies." (Emphasis added.) *Id.*, quoting App.R. 16(A)(7). "Since we are not required to address arguments that have not been sufficiently presented for review or supported by proper authority under App.R. 16(A)(7), we will not address Sheldon's arguments. *Stevens* at ¶ 83, citing *State v. Jordan*, 10th Dist. Franklin No. 11AP-691, 2012-Ohio-1760, ¶ 17, citing *State v. Gonzalez*, 10th Dist. Franklin No. 10AP-628, 2011-Ohio-1193, ¶ 28-29.

### *Manifest Weight of the Evidence*

{¶43} Having concluded that Sheldon's complicity-to-attempted-aggravated-murder convictions, complicity-to-attempted-aggravated-arson conviction under Count Five of the indictment, and his complicity-to-possession-of-dangerous-ordnance convictions are based on sufficient evidence, we next address Sheldon's arguments that his complicity-to-attempted-aggravated-murder convictions, complicity-to-attempted-aggravated-arson conviction under Count Five of the indictment, complicity-to-possession-of-dangerous-ordnance conviction, complicity-to-violating-a-protection-order conviction, and endangering-children conviction are against the manifest weight of the evidence. *Velez*, 2014-Ohio-1788, at ¶ 76.

{¶44} Sheldon contends that his complicity-to-attempted-aggravated-murder convictions, complicity-to-attempted-aggravated-arson conviction under Count Five of the indictment, complicity-to-possession-of-dangerous-ordnance

conviction, complicity-to-violating-a-protection-order conviction, and endangering-children conviction are against the manifest weight of the evidence because his convictions are principally based on the testimony of G.E.S., who was not credible. That is, Sheldon argues that G.E.S. "is the source of information, and his story changes from interview to interview, right up until his testimony on the stand at trial." (Appellants Brief at 14). Sheldon contends that G.E.S.'s testimony is not believable because "he admits to poisoning coffee, calling the police on his father, and admits that he had lots of other options to thwart the alleged plan, but that he didn't exercise any of those options." (*Id.*, citing Mar. 27, 2018 Tr., Vol. II, at 364-370). Moreover, Sheldon specifically points to the following "inconsistencies" with G.E.S.'s testimony: (1) G.E.S. initially states that "he filled the jug, and changes to say [Sheldon] did it"; and (2) G.E.S. "says he put all the implements into the bag, including the gas jug, but that he cant [sic] remember." (*Id.*, citing Mar. 27, 2018 Tr., Vol. II, at 448, 461). In other words, Sheldon contends that G.E.S. was not credible for two reasons: (1) he had motive to fabricate his story; and (2) there are inconsistences between his accounts of the events. Sheldon further contends that the weight of the evidence does not support his convictions because law enforcement did not detect the odor of gasoline in his vehicle on the night of the incident.[9]

---

[9] Although Sheldon directs us to "Official Transcript, Vol. III, Page 283" in reference to his argument, page 283 appears in volume IA. (Appellant's Brief at 12). There is no testimony regarding the odor of gasoline

**{¶45}** "Although we consider the credibility of witnesses in a manifest weight challenge, we are mindful that the determination regarding witness credibility rests primarily with the trier of fact because the trier of fact is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections— observations that are critical to determining a witness's credibility."

*State v. Bentz*, 3d Dist. Allen No. 1-16-17, 2017-Ohio-5483, ¶ 98, quoting *State v. Williams*, 8th Dist. Cuyahoga No. 98210, 2013-Ohio-573, ¶ 31, citing *State v. Clark*, 8th Dist. Cuyahoga No. 94050, 2010-Ohio-4354, ¶ 17, citing *State v. Hill*, 75 Ohio St.3d 195, 205 (1996) and *State v. Antill*, 176 Ohio St. 61, 66 (1964).

"'[N]inety percent of the total meaning of testimony is interpreted through non-verbal behavior, such as voice inflections, hand gestures, and the overall visual demeanor of the witness. The witness'[s] choice of words accounts for only ten percent of the meaning of their testimony.'"

*In re D.L.*, 3d Dist. Crawford No. 3-11-08, 2012-Ohio-1796, ¶ 32, quoting *State v. Brown*, 3d Dist. Allen No. 1-10-31, 2011-Ohio-1461, ¶ 51, quoting *State v. Evans*, 67 Ohio St.3d 405, 410-411 (1993). "Thus, the decision whether, and to what extent, to believe the testimony of each witness is within the province of the factfinder." *Id.*, citing *State v. Key*, 2d Dist. Montgomery No. 22609, 2009-Ohio-422, ¶ 25. Accordingly, we will not second guess "the jury's witness-credibility determination unless it is clear that the jury lost its way and a miscarriage of justice

---

reflected on page 283 of the transcript. However, Deputy Mark Ellis ("Deputy Ellis") of the Hardin County Sheriff's Office, whose testimony appears in Volume IIIA, testified regarding the odor of gasoline. (*See* Mar. 28, 2018 Tr., Vol. IIIA, at 946). We are assuming Deputy Ellis's testimony is the evidence of which Sheldon contends weighs against his convictions.

occurred." *State v. Thompson*, 3d Dist. Seneca No. 13-17-26, 2018-Ohio-637, ¶ 109, citing *State v. Mitchell*, 8th Dist. Cuyahoga No. 93076, 2010-Ohio-520, ¶ 20, citing *DeHass*, 10 Ohio St.2d 230, at paragraph one of the syllabus.

**{¶46}** Furthermore, "[a] defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial." *State v. Campbell*, 10th Dist. Franklin No. 07AP-1001, 2008-Ohio-4831, ¶ 23, citing *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21. The trier of fact "'"may take note of the inconsistencies and resolve or discount them accordingly, [but] such inconsistencies do not render [a] defendant's conviction against the manifest weight or sufficiency of the evidence."'" *State v. Ealy*, 10th Dist. Franklin No. 15AP-600, 2016-Ohio-1185, ¶ 19, quoting *State v. Samatar*, 152 Ohio App.3d 311, 2003-Ohio-1639, ¶ 113 (10th Dist.), quoting *State v. Craig*, 10th Dist. Franklin No. 99AP-739, 2000 WL 297252, *3 (Mar. 23, 2000).

**{¶47}** After reviewing the evidence, we cannot conclude that the jury lost its way and created such a manifest miscarriage of justice in its witness-credibility determination requiring that we reverse Sheldon's convictions and order a new trial. At trial, the State presented the testimony of 22 witnesses over seven days; whereas, the defense called a single witness. Importantly, the State presented the testimony of three law enforcement officers who interviewed G.E.S. or Sheldon regarding the August 12-13, 2017 incident—Deputy Justin Dick ("Deputy Dick"), Deputy Mark

Ellis ("Deputy Ellis"), and Detective Michael Conley ("Detective Conley") of the Hardin County Sheriff's Office. Specifically, Deputy Dick testified that he responded to D.S.'s residence, where he encountered G.E.S. and, later, Sheldon. (Mar. 28, 2018 Tr., Vol. III, at 813-814). Deputy Dick's body camera was activated during his interactions with G.E.S. and Sheldon and that footage was played for the jury. (*See* State's Ex. 15).

{¶48} While at D.S.'s residence, G.E.S. provided Deputy Dick with a sworn, written statement describing the incident. (Mar. 28, 2018 Tr., Vol. III, at 814-819); (Mar. 28, 2018 Tr., Vol. IIIA, at 820-822); (State's Ex. 2). Prior to codifying the statement, Deputy Dick informed G.E.S. that he would be charged with a felony offense—perjury—if he was later determined to be lying. (State's Ex. 15).

{¶49} Because G.E.S. informed Deputy Dick that Sheldon drove him to D.S.'s residence in a silver PT Cruiser—and Sheldon was "circling the block" in that vehicle—Deputy Dick left the residence to search for the silver PT Cruiser. (Mar. 28, 2018 Tr., Vol. IIIA, at 827); (State's Ex. 15). "As [he was] getting into [his] cruiser to leave the residence, [Deputy Dick saw] the [silver] PT Cruiser drive in front of the house * * *." (Mar. 28, 2018 Tr., Vol. IIIA, at 827-828). Deputy Ellis (who was nearby) stopped the silver PT Cruiser, which was operated by Sheldon, and Deputy Dick later joined Deputy Ellis and Sheldon. (*Id.* at 829-830). When asked why he was operating his vehicle in the vicinity of D.S.'s residence,

Sheldon informed Deputies Dick and Ellis that he was "looking for" G.E.S. (*Id.* at 834). Sheldon also admitted that he drove by D.S.'s residence four times. (Mar. 29, 2018 Tr., Vol. IV, at 1096).

{¶50} Deputy Dick informed Sheldon of G.E.S.'s statement and Sheldon denied any involvement in the plan to burn D.S.'s residence. (State's Ex. 15). (*See also* Mar. 30, 2018 Tr., Vol. VA, at 1508-1509). Thereafter, Sheldon informed Deputies Dick and Ellis that he was searching for G.E.S. at D.S.'s residence because G.E.S. "mentioned that he was wanting to get a bicycle from [D.S.'s] house." (Mar. 28, 2018 Tr., Vol. IIIA, at 834). Deputies Dick and Ellis instructed Sheldon to meet them at the Hardin County Sheriff's Office to provide them with a statement. (State's Ex. 15). Once at the sheriff's office, Deputy Ellis (relying on an interview tactic) informed Sheldon that he did not believe his version of events. (Mar. 28, 2018 Tr., Vol. IIIA, 854, 935-936); (State's Ex. 15).

{¶51} Because of G.E.S.'s and Sheldon's conflicting statements, the investigation was transferred to Detective Conley. Detective Conley, on August 13, 2017, first interviewed G.E.S., then Sheldon; then, Detective Conley interviewed G.E.S. again on August 18, 2017. (Mar. 29, 2018 Tr., Vol. IV, at 1086-1087). The video recordings of those interviews were presented to the jury. (*See* State's Exs. 19, 73). After reviewing the evidence that he collected during his investigation, Detective Conley concluded that he did not "have any evidence to charge" G.E.S.

because he did not have any evidence reflecting that G.E.S. "had any criminal intent." (Mar. 29, 2018 Tr., Vol. IVA, at 1120).

{¶52} Further, when Detective Conley asked G.E.S. about what happened, G.E.S. provided "the story about that situation in the house," while Sheldon (instead of providing only what happened that night) provided "an entire family history." (Mar. 30, 2018 Tr., Vol. VA, at 1503-1504). Detective Conley also testified that Sheldon (during his interview with Detective Conley) "didn't know anything about what happened out at D.S.'s" residence and "was totally amazed [that G.E.S.] was even at the house" despite Deputy Dick informing Sheldon as to G.E.S.'s version of events.[10] (*Id.* at 1508-1509). Detective Conley further testified that Sheldon would deflect or change the subject of questions that Detective Conley posed to Sheldon. (*Id.* at 1537). In sum, Detective Conley concluded (based on the totality of his investigation) that the August 12-13, 2017 incident did not involve a "conspiracy" in which G.E.S. conspired with others to frame Sheldon. (*Id.* at 1528-1529).

{¶53} The State also presented the testimony of D.S., G.E.S.'s brothers, T.S. and Hunter Sheldon ("Hunter"), Hunter's girlfriend, Cidra Billiel ("Billiel"), and G.E.S.'s biological mother, Geneva Chrysanthus ("Chrysanthus")—all of whose testimony was consistent to the testimony of G.E.S. *Compare State v. Hightower*, 8th Dist. Cuyahoga No. 93024, 2010-Ohio-1055, ¶ 18 ("Despite some minor

---

[10] Detective Conley was not aware that Deputy Dick informed Sheldon as to G.E.S.'s version of events until after his interview with Sheldon. (Mar. 30, 2018 Tr., Vol. IVA, at 1510).

inconsistencies in the testimony of the State's witnesses, we cannot conclude that Hightower's conviction was against the manifest weight of the evidence. The State's witnesses were consistent in their description of the assault, and it was within the province of the trial court to determine whether their testimony was sufficiently reliable and accurate to be worthy of belief."). Indeed, T.S. testified that Sheldon "asked [him] if [he] was willing to go with him to poke a hole in the dryer vent in the back of the house, put the funnel through, and fill it up with gasoline, and light [D.S.'s] house on fire." (Mar. 27, 2018 Tr., Vol. IIA, at 505). Further, T.S. testified that Sheldon then informed G.E.S. of the plan and asked him if he was willing to do it. (*Id.* at 507).

{¶54} Next, Hunter testified that G.E.S. contacted him, informed him of Sheldon's plan, and asked him to warn D.S. (*Id.* at 542, 549-550, 555-559). (*See* State's Exs. 4, 12). (*See also* State's Ex. 83). Based on his conversation with G.E.S., Hunter contacted D.S. to relay G.E.S.'s warning and to inform her that G.E.S. planned to "meet [her] at the screen door out back." (Mar. 27, 2018 Tr., Vol. IIA, at 551, 554); (State's Ex. 14). Likewise, Billiel testified that G.E.S. initially contacted Hunter through the Facebook application on her phone. (Mar. 27, 2018 Tr., Vol. IIA, at 608-609). She also testified that she previously overheard Sheldon discussing a plan around July 4, 2017 "to set the house on fire and blame it on fireworks." (*Id.* at 612-613).

{¶55} Further, Chrysanthus testified that she was with Hunter and Billiel when G.E.S. contacted Hunter through the Facebook application on Billiel's phone. (*Id.* at 629-630). According to Chrysanthus, she overheard G.E.S. state that "his dad wanted him to burn down his stepmom's house." (*Id.* at 630). As a result, she spoke with G.E.S., who "was panicked, and he was saying that his dad was making him go with him to [D.S.'s] residence to set the house on fire." (*Id.* at 630, 632). (*See* State's Ex. 109). Chrysanthus advised G.E.S. not to "do it," to which, according to Chrysanthus, G.E.S. responded that he did not intend to; rather, he was attempting to contact D.S. to "warn her." (Mar. 27, 2018 Tr., Vol IIA, at 633).

{¶56} D.S. also testified that she received a phone call from Hunter relaying G.E.S.'s warning and informing her that G.E.S. "was going to knock on the door." (Mar. 28, 2018 Tr., Vol. III, at 676, 712-713). (*See* State's Ex. 12). In response to Hunter's message, D.S. requested that Hunter "send * * * the messages he was getting from [G.E.S.] to [her] email, and hung up with Hunter, and called the Sheriff, and told them what [she] was told." (Mar. 28, 2018 Tr., Vol. III, at 676). According to D.S., she requested that Hunter forward the messages to her because she wanted to show the messages to law enforcement, not because she suspected G.E.S. or Hunter were trying to "trick" her. (*Id.* at 710-711).

{¶57} Because Deputy Dick responded to her residence before G.E.S. arrived, Deputy Dick instructed that "if [she] heard a knock at the back door to call

the Sheriff's Office before [she] went to the door." (*Id.* at 687-688). Later, when D.S. heard "a knock at the back door," she "called the Sheriff's Office" to report the knock, and then opened the door for G.E.S. once she knew he "was alone" because she "trusted him." (*Id.* at 688-690). D.S. testified that G.E.S. "told [her] what his dad had planned, and he pointed at the bag laying on the porch * * *." (*Id.* at 690).

**{¶58}** The State also presented the testimony of Detective Terry Sneary ("Detective Sneary") of the Hardin County Sheriff's Office who analyzed the data contained in G.E.S.'s, D.S.'s, and Sheldon's cell phones. (*See* State's Exs. 4, 7, 17, 44, 45, 104). (*See also* State's Ex. 8, 12, 13, 14). Detective Sneary recovered (from G.E.S.'s and D.S.'s cell phones) the calls and messages that were exchanged between G.E.S., D.S., Hunter, Billiel, and Chrysanthus. (Mar. 29, 2018 Tr., Vol. IV, at 1004, 1009-1011, 1014-1016). In relation to Sheldon's cell phone, Detective Sneary did not recover any evidence of significance to Sheldon's convictions. (*Id.* at 993-998).

**{¶59}** In his defense, Sheldon offered the testimony of Jonathan Rhoads ("Rhoads"), who was incarcerated with Sheldon. (Apr. 2, 2018 Tr., Vol. VIA, at 1784, 1787). Rhoads testified that he conversed with Billiel in August 2017—after the August 12-13, 2017 incident and after she ended her relationship with Hunter. *(Id.* at 1787-1788). According to Rhoads, Billiel informed him that G.E.S. and Hunter "were trying to set [Sheldon] up * * *." (*Id.* at 1792). Rhoads provided

Sheldon with a written statement recounting his conversation with Billiel, which was admitted into evidence at trial. (Defendant's Ex. FFF). Rhoads's statement reflects that Billiel shared with him that G.E.S. wanted to "set there [sic] dad up because they knew he was going to tell on them" for "trashing [D.S.'s] cars" and because [G.E.S.] wanted to live with Hunter but [Sheldon] wouldn't let him * * *." (*Id.*). (*See also* Apr. 2, 2018 Tr., Vol. VIA, at 1792-1793).

{¶60} Although Sheldon did not testify in his defense, the jury was able to observe Sheldon's interactions with Deputies Dick and Ellis and Sheldon's interview with Detective Conley. (*See* State's Exs. 15, 19). It was well within the province of the trier of fact to determine the credibility of the evidence presented at trial. *See State v. Bitting*, 9th Dist. Summit No. 25774, 2011-Ohio-5892, ¶ 11; *Hightower*, 2010-Ohio-1055, at ¶ 16-17; *State v. Jackson*, 8th Dist. Cuyahoga No. 94761, 2011-Ohio-462, ¶ 16. *See also State v. Clark*, 6th Dist. Lucas No. L-17-1256, 2018-Ohio-4759, ¶ 24. Indeed, it was well within the province of the trier-of-fact to determine Rhoads's credibility in recounting his conversation with Billiel, including the prerogative to find Rhoads not to be truthful. Moreover, it was well within the jury's prerogative to find Sheldon's denials—as evidenced in State's Exhibits 15 and 19—not to be truthful. *See State v. Voll*, 3d Dist. Union No. 14-12-04, 2012-Ohio-3900, ¶ 27.

**{¶61}** Regarding G.E.S.'s alleged conflicting statements as to whom filled the container with gasoline, G.E.S. stated that he misspoke and the record reflects that he *immediately* corrected his misstatement. Indeed, G.E.S.'s statement to which Sheldon points as detrimental to G.E.S.'s credibility is as follows: "I, he filled the jug." (*See* Mar. 27, 2018 Tr., Vol. II, at 448); (State's Ex. 19). Moreover, although G.E.S. admits that he could not remember how the gasoline container was secured in the bag, whether the gasoline container was in the bag or who put it into the bag are inconsequential to any element of any offense of which Sheldon was convicted. *Compare Ealy*, 2016-Ohio-1185, at ¶ 20 (concluding that Ealy's convictions were not against the manifest weight of the evidence because "the inconsistencies in [the witness's] pretrial accounts and his trial testimony involve relatively minor details, not the elements of the offenses"), citing *Craig*, 2000 WL 297252, at *3, *State v. Butler*, 10th Dist. Franklin No. 13AP-360, 2013-Ohio-5397, ¶ 14-17, and *State v. Brown*, 9th Dist. Summit No. 18591, 1998 WL 487039, *6 (Aug. 19, 1998). Despite these two minor inconsistences, G.E.S. was consistent in his description of the events of August 12-13, 2017 throughout his interviews with Deputy Dick, Detective Conley, and at trial, and the balance of the State's evidence buttressed G.E.S.'s testimony. *See Hightower* at ¶ 18.

**{¶62}** Finally, the evidence that we summarized in our sufficiency-of-the-evidence and witness-credibility analyses is weightier than Deputy Ellis's testimony

that he did not detect the odor of gasoline when he first encountered Sheldon. Specifically, when asked whether he detected the odor of gasoline when he approached Sheldon's vehicle and Sheldon "rolled that window down," Deputy Ellis responded that he "didn't get that close to the car." (Mar. 28, 2018 Tr., Vol. IIIA, at 946-947). Deputy Ellis further testified that he did not detect the odor of gasoline when Sheldon later "opened the door." (*Id.* at 947). Yet, Deputy Ellis testified that, when he retrieved (from D.S.'s "yard") the "fire-starting" kit he noticed the odor of the gasoline. (*Id.* at 947-948). However, based on the evidence that we summarized in our sufficiency-of-the-evidence analysis and in conjunction with Sheldon's manifest-weight-of-the-evidence arguments, we cannot say that the jury lost its way in concluding that Sheldon committed those crimes.

{¶63} Therefore, we conclude that Sheldon's complicity-to-attempted-aggravated-murder convictions, complicity-to-attempted-aggravated-arson conviction under Count Five of the indictment, complicity-to-possession-of-dangerous-ordnance conviction, complicity-to-violating-a-protection-order conviction, and endangering-children conviction are not against the manifest weight of the evidence.

{¶64} Sheldon's first assignment of error is overruled.

**Assignment of Error No. II**

**The Trial Court erred in failing to give an instruction as to the weight given to the testimony of an accomplice.**

-42-

**{¶65}** In his second assignment of error, Sheldon argues that the trial court abused its discretion by failing to instruct the jury to weigh G.E.S.'s testimony "'with great caution.'" (Appellant's Brief at 15, quoting R.C. 2923.03(D)). That is, Sheldon argues that G.E.S. was an accomplice to his alleged crimes and the trial court should have instructed the jury as provided in R.C. 2923.03(D).

*Standard of Review*

**{¶66}** "Ordinarily, the trial court has discretion to decide to give or refuse a particular instruction, and an appellate court will not disturb that decision absent an abuse of discretion." *State v. Teitelbaum*, 10th Dist. Franklin No. 14AP-310, 2016-Ohio-3524, ¶ 127, citing *Clark v. Grant Med. Ctr.*, 10th Dist. Franklin No. 14AP-833, 2015-Ohio-4958, ¶ 50. *See State v. Glenn*, 2d Dist. Montgomery No. 27639, 2018-Ohio-2326, ¶ 20. *See also State v. Harrison*, 3d Dist. Logan No. 8-14-16, 2015-Ohio-1419, ¶ 61; *State v. Brown*, 11th Dist. Lake No. 2014-L-037, 2016-Ohio-1358, ¶ 71, *abrogated on other grounds*, *State v. Smith*, 11th Dist. Ashtabula No. 2015-A-0027, 2016-Ohio-8420. However, when a jury instruction raises a question of law, we apply a de novo standard of review. *See Glenn* at ¶ 20. *See also Teitelbaum* at ¶ 127, citing *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 21, citing *Kokitka v. Ford Motor Co.*, 73 Ohio St.3d 89, 93 (1995). "De novo review is independent, without deference to the lower court's decision." *State v. Hudson*, 3d Dist. Marion No. 9-12-38, 2013-Ohio-647, ¶ 27.

*Analysis*

**{¶67}** R.C. 2923.03(D) provides:

If an alleged *accomplice* of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:

"The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.

It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth."

(Emphasis added.) *See State v. Woodson*, 10th Dist. Franklin No. 03AP-736, 2004-Ohio-5713, ¶ 17 (stating that "trial courts must comply with R.C. 2923.03(D) and "'are not in a position to ignore [the statutory] directive[]'""), quoting *State v. Crawford*, 10th Dist. Franklin No. 01AP-1428, 2003-Ohio-1447, ¶ 31, quoting *State v. Williams*, 117 Ohio App.3d 488, 495 (1st Dist.1996).

**{¶68}** To require the jury instruction under R.C. 2923.03(D), an "accomplice"—within the meaning of the statute—"'must be a person indicted for the crime of complicity.'" *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, ¶ 131, quoting *State v. Wickline*, 50 Ohio St.3d 114, 118 (1990). Indeed, "[t]he purpose of the cautionary instruction requirement is to ensure that juries are

informed that the testimony of an accomplice is inherently suspect because an accomplice is likely to have a motive to conceal the truth or otherwise falsely inculpate the defendant." *State v. Sillett*, 12th Dist. Butler No. CA2000-10-205, 2002-Ohio-2596, ¶ 19, citing *State v. Santine*, 11th Dist. Ashtabula No. 97-A-0025, 1998 WL 552991, *5 (June 26, 1998). *See also State v. Bentley*, 11th Dist. Portage No. 2004-P-0053, 2005-Ohio-4648, ¶ 58, citing *Williams* at 495.

**{¶69}** "However, there could be a rare circumstance where an instruction is required despite the witness not being indicted for the crime of complicity." *State v. Reed*, 9th Dist. Wayne No. 12CA0051, 2013-Ohio-3970, ¶ 67, citing *State v. Smith*, 9th Dist. Summit No. 25650, 2012-Ohio-794, ¶ 22, citing *Sillett* at ¶ 19. "An example of such a case might be when the accomplice is offered immunity in exchange for testimony and thus may never be indicted for the crime." *Id.*, citing *Sillett* at ¶ 19 (recognizing "that there may be rare instances in which a person who may be an accomplice is not indicted for a crime, but has motivation to lie or conceal the truth in return for their testimony. For example, an accomplice may be offered immunity in exchange for testimony and never be indicted for the crime. In such cases, there is reason for the witness'[s] testimony to be viewed with the same suspicion as that of an indicted accomplice"), citing *State v. Santine*, 11th Dist. Ashtabula No. 97-A-0025, 1998 WL 552991, *4-5 (June 26, 1998).

{¶70} In the matter before us, the trial court was not required to provide the R.C. 2923.03(D) jury instruction because G.E.S. was neither indicted for the crime of complicity nor offered immunity in exchange for his testimony. *See Sillett* at ¶ 17, 20. Whether a witness *could* be indicted as an accomplice does not instigate the necessity of instructing the jury as provided in R.C. 2923.03(D). *See id.* at ¶ 19. Moreover, the record reflects that Sheldon's trial counsel was afforded the opportunity to cross-examine G.E.S. on issues reflecting his credibility. *Compare id.* at ¶ 21 (noting that "a review of the record reveals that appellant's counsel thoroughly cross-examined [the witness] regarding issues reflecting on her credibility"). Likewise, the trial court provided the standard instructions to the jury regarding their duty to evaluate the credibility of witnesses. *See id.*; *Bentley*, 2005-Ohio-4648, at ¶ 59. Accordingly, the trial court did not err by failing to provide the jury the R.C. 2923.03(D) instruction. Sheldon's second assignment of error is overruled.

## Assignment of Error No. III

**The Trial Court erred in allowing testimony from witnesses that were not timely disclosed to Appellant's trial counsel.[11]**

---

[11] Notwithstanding Sheldon's statement of his third assignment of error, Sheldon's argument in relation to his third assignment of error states, "The Trial Court erred to the detriment of Appellant and abused its discretion when it failed to exclude certain exhibits to be admitted when they were disclosed late, if at all to opposing counsel." (Appellant's Brief at 5, 16).

{¶71} In his third assignment of error, Sheldon argues that the trial court erred by admitting State's Exhibits 9, 10, 12, 13, and 84. In particular, he contends that those exhibits should have been excluded from the record because the State failed to disclose such exhibits (to the defense) as it is required to do under Crim.R. 16.

*Standard of Review*

{¶72} Crim.R. 16 provides the discovery rules for criminal proceedings. *State v. Engle,* 166 Ohio App.3d 262, 2006-Ohio-1884, ¶ 7 (3d Dist.). We review a trial court's Crim.R. 16 discovery-sanction decision for an abuse of discretion. *State v. Stiles*, 3d Dist. Allen No. 1-08-12, 2009-Ohio-89, ¶ 45, citing *State v. Gibson*, 3d Dist. Allen No. 1-06-74, 2007-Ohio-3345, ¶ 12. *See also State v. Dahms*, 3d Dist. Seneca No. 13-16-16, 2017-Ohio-4221, ¶ 114. An abuse of discretion suggests that a decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157-158 (1980).

*Analysis*

{¶73} The failure to comply with Crim.R. 16 is governed by Crim.R. 16(L)(1) which provides, in its relevant part:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not

disclosed, or it may make such other order as it deems just under the circumstances.

Crim.R. 16(L)(1). "'[I]n determining the appropriate sanction, the trial court must make an inquiry into the circumstances of the discovery violation.'" *Stiles* at ¶ 45, quoting *Engle* at ¶ 8, citing *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 511 (1987), paragraph two of the syllabus. "Further, 'the trial court "must impose the least severe sanction that is consistent with the purpose of the rules of discovery."'" *Id.*, quoting *Engle* at ¶ 8, quoting *Papadelis* at paragraph two of the syllabus.

{¶74} The prosecution's violation of Crim.R. 16 is reversible error "only when there is a showing that (1) the prosecution's failure to disclose was willful, (2) disclosure of the information prior to trial would have aided the accused's defense, and (3) the accused suffered prejudice." *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 131, citing *State v. Parson*, 6 Ohio St.3d 442, 445 (1983). *See also State v. Williams*, 10th Dist. Franklin No. 16AP-350, 2018-Ohio-974, ¶ 22 (noting "that all three of the *Parson* factors must be present to demonstrate reversible error under Crim.R. 16"), citing *State v. Davis*, 10th Dist. Franklin No. 08AP-443, 2009-Ohio-1375, ¶ 25-27 and *State v. Wiley*, 10th Dist. Franklin No. 10AP-679, 2011-Ohio-3595, ¶ 15.

{¶75} In this case, Sheldon contends that the State failed to disclose five exhibits: State's Exhibit 9 (audio recordings of D.S.'s calls to the Hardin County Sheriff's Office); State's Exhibit 10 (a copy of the protection order); State's Exhibit

12 (screen shots of Hunter's email to D.S.); State's Exhibit 13 (a screen shot of Hunter and G.E.S.'s Facebook messenger conversation); and State's Exhibit 84 (a video recording of an interview of T.S.). Regarding State's Exhibits 9, 10, 12, and 13, Sheldon offers no argument—as he is required to do—reflecting that the State willfully failed to disclose those exhibits; whether the disclosure of that information prior to trial (assuming that they were not disclosed) would have aided in his defense; or how he was prejudiced by any alleged failure of disclosure of those exhibits. *See State v. Dougherty*, 3d Dist. Hancock No. 5-94-2, 1996 WL 517300, *6 (Sept. 12, 1996); App.R. 16.

{¶76} Regardless, we see no evidence in the record that the State failed to disclose State's Exhibits 9, 10, 12, or 13. (*See, e.g.*, Doc. Nos. 11, 37). In response to Sheldon's trial counsel's allegations that the State failed to provide those exhibits, the State specifically denied the allegations. (*See* Mar. 26, 2018 Tr., Vol. I, at 128-132). Further, Sheldon admitted that he received Exhibits 12 and 13 on March 21, 2018—several days before the first day of his trial on March 26, 2018. (*See* Apr. 2, 2018 Tr., Vol. VI, at 1743). (*See also* Mar. 26, 2018 Tr., Vol. I, at 133). In response to Sheldon's objection to State's Exhibits 12 and 13, the State responded, "We gave it to them, we continued the trial, they had more time to run it back than we did * * *." (Apr. 2, 2018 Tr., Vol. VI, at 1743). The rule requires the provision of specific evidence; however, the rule does not explicitly state when provision of that evidence

is required.  *See State v. Frye*, 3d Dist. Allen No. 1-17-30, 2018-Ohio-894, ¶ 121.

"Rather, the timeliness determinations are left to the discretion of the trial court."

*Id.*

**{¶77}** Sheldon's argument as to State's Exhibit 9 lacks merit since he presented to the jury and sought admission into evidence the *same* evidence—Defendant's Exhibit GGG.  (*See also* Doc. No. 111).  Likewise, Sheldon did not object to the State playing the portion of (the original) recordings reflected by State's Exhibit 9—D.S.'s calls to the Hardin County Sheriff's Office.[12]  (*See* Mar. 26, 2018 Tr., Vol. IA, at 217-219).  However, at the time that the trial court was admitting the State's exhibits into evidence, Sheldon objected (on another ground) to the admission of the original version of State's Exhibit 9.  (Apr. 2, 2018 Tr., Vol. VI, at 1740).  As a remedy to his objection, Sheldon requested that the trial court exclude the portion of State's Exhibit 9 containing the interview of Chrysanthus, which it did.  (*Id.* at 1742).  Accordingly, the trial court committed no error by permitting the State's use of D.S.'s calls to the Hardin County Sheriff's Office or by admitting the calls into evidence.

**{¶78}** As to State's Exhibit 10, Sheldon objected at the time the State introduced it and at the time that the State sought to admit it into evidence.  However, the trial court overruled Sheldon's objections after concluding that

---

[12] The record reflects that the "original" version of State's Exhibit 9 included D.S.'s calls to the Hardin County Sheriff's Office and an interview of Chrysanthus.  (*See* Apr. 2, 2018 Tr., Vol. VI, at 1740).

Sheldon failed to demonstrate that he would have been prejudiced even if the State failed to disclose a copy of the protection order. That is, the trial court concluded that the protection order is a public record and there is no dispute that Sheldon was aware of its existence. Thus, there is no evidence of surprise or prejudice to Sheldon, and the trial court reasonably allowed the State to present the civil protection order at trial and admit it into evidence. *See State v. Vandyne*, 2d Dist. Clark No. 2013 CA 1, 2013-Ohio-3386, ¶ 16.

{¶79} Next, even though Sheldon objected to the introduction and admission of State's Exhibit 12, his argument (on appeal) lacks merit. (Mar. 27, 2018 Tr., Vol. IIA at 545); (Apr. 2, 2018 Tr., Vol. VI, at 1743). In addition to the lack of evidence in the record reflecting that Exhibit 12 was not provided, the evidence in the record reflects that Exhibit 12 is not new evidence. Particularly, State's Exhibit 12 reflects screenshots of an email from Hunter to D.S. depicting screenshots of the Facebook messenger conversation between Hunter and G.E.S. The content of the Facebook messenger conversation merely bolsters G.E.S.'s, Hunter's, and D.S.'s version of the events. Accordingly, even assuming that the State should have provided the evidence sooner, Sheldon was not prejudiced by the evidence.

{¶80} Next, and notwithstanding Sheldon's objection as to the introduction and admission of State's Exhibit 13, Sheldon's discovery-violation claim regarding State's Exhibit 13 is disinguous. Specifically, State's Exhibit 13 reflects

substantially similar evidence to the evidence reflected in Defendant's Exhibit N. State's Exhibit 13 and Defendant's Exhibit N are screenshots of Hunter and G.E.S.'s Facebook messenger conversation. In comparison to State's Exhibit 13, Defendant's Exhibit N reflects preceding and subsequent messages between the brothers to the messages reflected in State's Exhibit 13.

**{¶81}** In reference to State's Exhibit 84, the only argument that Sheldon presents on appeal is that he was prejudiced by the State's late disclosure because he "was given a short period in order to review a video interview that was previously undisclosed." (Appellant's Brief at 17). In other words, Sheldon failed to make an argument with respect to whether the State willfully failed to disclose the interview of T.S.; whether the disclosure of the evidence would have changed his trial preparation; or as to the specific prejudice he suffered as a result of the late disclosure as he is required to do. *See Dougherty*, 1996 WL 517300, at *6; App.R. 16. Notwithstanding Sheldon's failure to present a proper argument on appeal, the trial court exercised its discretion by inquiring into the circumstances of the discovery violation and imposed the least severe sanction as was consistent with the purpose of the rules of discovery. Specifically, Sheldon notified the trial court of the discovery violation prior to the start of trial and objected to the State calling T.S. (the subject of the interview contained on State's Exhibit 84) as a witness. (Mar. 26, 2018 Tr., Vol. I, at 135); (Mar. 26, 2018 Tr., Vol. IA, at 245-246). After

inquiring as to the nature of Sheldon's objection concerning the discovery violation, the trial court instructed the State to call T.S. as a witness the following day to permit Sheldon sufficient time to review the recording of T.S.'s interview. (Mar. 26, 2018 Tr., Vol. IA, at 246-248). Importantly, the record reflects that T.S.'s interview is "a short one," "15 to 20 minutes," that Sheldon had ample opportunity to review the recording the evening before T.S. was called as a State's witness, and that Sheldon was afforded the opportunity to thoroughly cross-examine T.S. Thus, the trial court reasonably remedied any discovery violation.

**{¶82}** In sum, Sheldon contends that "it seems the sheer number of exhibits and testimony that was [sic] not properly disclosed, but was [sic] used at trial would have to prejudice [him] in violation of the rules of discovery." (Appellant's Brief at 17). Importantly, there is no automatic presumption of prejudice when one or more discovery-rule violations occurs; rather, a defendant has an affirmative burden of demonstrating *how* he was prejudiced by the discovery-rule violation—that is, that the outcome of his trial would have been different. *See State v. Thomas*, 7th Dist. Belmont No. 17 BE 0028, 2018-Ohio-3768, ¶ 32; *State v. Green*, 8th Dist. Cuyahoga No. 81232, 2003-Ohio-1722, ¶ 20; *State v. Wangler*, 3d Dist. Allen No. 1-11-18, 2012-Ohio-4878, ¶ 108.

**{¶83}** Considering the nature of the evidence of which Sheldon contends formed the basis of a discovery-rule violation, we see no indication that any of the

evidence would have changed his trial strategy or the outcome of his trial. *See State v. Maupins*, 2d Dist. Montgomery No. 22397, 2008-Ohio-4640, ¶ 10 (concluding that, even though "Maupins argues that he 'may have' altered his trial strategy had he been given [the evidence] ahead of trial," there was no evidence that he was prejudiced by the late discovery because Maupins failed to "point to anything in the [evidence] that would have changed his trial strategy"); *State v. Rich*, 12th Dist. Butler No. CA2012-03-044, 2013-Ohio-857, ¶ 68 (concluding that "none of the information would have been of material assistance to Rich in preparing his defense").

{¶84} Sheldon's third assignment of error is overruled.

{¶85} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW and WILLAMOWSKI, J.J., concur.**

**/jlr**